**In re Donald S. AUSTIN, Debtor.**

**FEDERAL TRADE COMMISSION,
Plaintiff,**

**v.**

**Donald S. AUSTIN, Defendant.**

**Bankruptcy Nos. 91 B 00675, 91 A 00399.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

April 7, 1992.

John Rothchild, F.T.C., Washington, D.C., for plaintiff.

Richard Larson, Myler, Ruddy & McTavish, Aurora, Ill., for defendant.

## MEMORANDUM OPINION

DAVID H. COAR, Bankruptcy Judge.

This matter comes before the Court on the Plaintiff's Motion for Summary Judgment. The Court, having considered the memoranda of law and affidavits submitted by the parties, now rules as follows.

## FINDINGS OF FACT

The Defendant in this adversary proceeding, Donald S. Austin [Austin], is the founder, president, and sole shareholder of several corporations [Austin corporations] which operate a chain of art galleries in Illinois, California, and Michigan. In this capacity, Austin is responsible for developing and implementing corporate policies for the sale of artwork at his galleries. He is also responsible for choosing the artwork which is purchased and offered for sale in the galleries and for selecting artwork suppliers.

The Plaintiff in this adversary proceeding, the Federal Trade Commission [FTC], is an independent federal agency which is charged with enforcement of § 5(a) of the Federal Trade Commission Act [Act], 15 U.S.C. § 45(a). Section 5(a) of the Act prohibits unfair or deceptive acts or practices in or affecting commerce.

On May 3, 1988, the FTC brought an action against Austin, the Austin corporations, and Joanne Granquist, the executive vice-president of the Austin corporations [Defendants] in the United States District Court for the Northern District of Illinois. This action was denominated *FTC v. Austin Galleries of Illinois, Inc., et al.*, No. 88 C 3845 (N.D.Ill. filed May 3, 1988). In this action, the FTC alleged that the Defendants had violated § 5(a) of the Federal Trade Commission Act by falsely representing the authenticity and value of several art lithographs purportedly by the well-known artists Salvador Dali, Marc Chagall, Joan Miró, and Pablo Picasso. The FTC sought to enjoin the Defendants from making such false representations in connection with the advertising, sale, or other promotion of artworks. In addition, the FTC sought to compel the Defendants to disgorge profits earned from the allegedly fraudulent sales, to rescind outstanding purchase orders, and to make restitution to customers injured by the alleged misrepresentations.

On June 13, 1988, the District Court entered a stipulated preliminary injunction. The preliminary injunction, *inter alia*, prohibited the Defendants from selling any artworks represented to be authentic or original lithographs by Dali, Chagall, Miró, or Picasso except upon 20 days' written notice to the FTC. The purpose of the written notice was to give the FTC an opportunity to have the prints in question examined for authenticity and to object to the sale if the prints were found to be inauthentic. Pursuant to this provision, the Defendants notified the FTC on June 27, 1988, that they wished to sell 110 Chagall prints and 12 Miró prints represented as authentic originals. The FTC had these prints examined by art experts, who concluded that at least 113 of these 122 prints were inauthentic.

In response to this development, the FTC moved the District Court on August 16, 1988, to modify the June 13 preliminary injunction so as to completely prohibit the Defendants from selling any prints represented as authentic originals by Dali, Chagall, Miró, or Picasso. On October 24, 1988, the District Court granted the FTC's

motion with respect to lithographs by the four named artists, and imposed lesser restrictions on the Defendants' sale of non-lithographic works by those artists.

On April 11, 1990, Austin and the Austin corporations [the Austin Defendants] stipulated to the entry of a Consent Decree and Permanent Injunction.[1] The injunctive provisions prohibited the Austin Defendants from making misrepresentations in the sale of artworks. In addition, the Consent Decree required the Austin Defendants to pay $625,000 into a consumer redress fund to be administered by the FTC. This $625,000 represented full satisfaction of all monetary claims asserted by the FTC. The Austin Defendants were required to pay an additional $5,000, however, for each month or portion of a month between September 1, 1990, and January 1, 1991, that they failed to make full payment of the amount due under the Consent Decree.

The Consent Decree further provided that the Austin Defendants would be considered in default if they failed to pay the full amount due by January 1, 1991. Upon default, the Austin Defendants would become liable to the FTC for $1.5 million, due and payable immediately. In addition, the parties entered a Stipulation for Judgment which provided that if the District Court were to find the Austin Defendants in default under the Consent Decree, and such default was not excused, then the following would occur:

1) judgment would be entered against the Austin Defendants for the amount remaining due under the Consent Decree, plus interest at the rate provided in 28 U.S.C. § 1961;

2) the Austin Defendants would make no objection to the FTC's use in any bankruptcy proceeding of the Answer to the Amended Complaint filed by the Austin Defendants, dated July 7, 1988, or the Corporate Defendants' Response to Plaintiff's First Request for Corporate Defendants' Admissions, dated May 19, 1989; and

3) the Austin Defendants would admit the truth of several of the allegations contained in the FTC's Amended Complaint filed in *FTC v. Austin Galleries, Inc., et al.,* No. 88 C 3845 (N.D.Ill., filed May 3, 1988).

The Austin Defendants failed to pay the full amount due under the Consent Decree by the January 1, 1991, deadline. The Austin corporations filed a petition for relief under Chapter 11 of the Bankruptcy Code on January 9, 1991. Austin filed a Chapter 11 petition on January 11, 1991. Pursuant to the Consent Decree between the Austin Defendants and the FTC, the District Court entered a judgment on January 25, 1991 against the Austin Defendants for $1.5 million. Enforcement of this judgment was stayed under § 362(b)(5) of the Bankruptcy Code.

The District Court entered the parties' Stipulation for Judgment as part of its order on January 25, 1991. Pursuant to this Stipulation, Austin admitted the following factual allegations:

a) Defendant Donald Austin ("Austin") is president, founder, and sole shareholder of Austin Galleries, Austin Galleries of Illinois, and Austin Galleries of Michigan. Individually or in concert with others, he directs, controls, formulates, or participates in the acts and practices of the corporate defendants including the acts and practices set forth herein. He transacts or has transacted business in the Northern District of Illinois.

b) Defendant Austin has participated in or directed the purchase of all art work by Austin Galleries, including works by artists such as Pablo Picasso, Marc Chagall, Salvador Dali and Joan Miró.

c) Defendant Austin has developed or authorized implementation of corporate policies governing the sale of art work, including representations as to their originality and value.

d) Defendant Austin has developed or authorized the implementation of corporate policies governing returns or

---

**1.** Defendant Joanne Granquist entered a separate Consent Decree and Permanent Injunction with the FTC. This document is not relevant to the instant proceeding.

exchanges of art work in instances where consumers have cited concerns as to a work's originality.

e) Defendant Austin has authorized or directed the preparation of documentation for consumers attesting to the authenticity and value of art work sold by Austin Galleries.

f) As set forth herein, in connection with the sale of their art work, defendants have engaged in numerous violations of Section 5(a) of the FTC Act.

g) In numerous instances, defendants have falsely represented that they are selling authentic, original, limited edition, hand-signed graphic art by well-known artists, including, among others, Salvador Dali, Marc Chagall, and Pablo Picasso. In fact, in numerous instances, the graphic art work sold by defendants were not authentic, original, limited edition, hand-signed graphic art by the named artist. In fact, in numerous instances, the named artist did not play a substantial role in the creation and production of the graphic art or did not retain control over key aspects of the creation and production of the edition.

h) In numerous instances, defendants have falsely represented that the art work they market for $200 to several thousand dollars have a market value comparable to or greater than the prices which defendants charge for them. In fact, in numerous instances, the art works which defendants sell have a market value of, at most, $50 because the art works sold by defendants are not authentic works of art.

i) In numerous instances, defendants have falsely represented that the art work they are marketing are [sic] sound investments and that customers can reasonably expert [sic] art works sold by defendants to increase substantially in value over the purchase price. In fact, in numerous instances, defendants' art work has no investment value and consumers cannot reasonably expect to make a profit over the purchase price because, among other reasons, the art work sold by defendant is not authentic works [sic] of art and thus, has no investment value and no resale market.

j) The aforementioned acts and practices of the corporate defendants constitute unfair or deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

k) As a result of [his] corporate duties and responsibilities ..., Donald Austin ... knew or should have known of the acts and practices listed in paragraphs [f–i], and failed to act within [his] authority to control such acts and practices.

l) Donald Austin ... participated in the acts and practices listed in paragraphs [f–i] above.

m) As a result of the acts and practices enumerated in paragraphs [f–i] above, defendant[ ] Austin [is] individually liable for unfair or deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

Amended Complaint for Injunction and Other Equitable Relief, *FTC v. Austin Galleries, Inc., et al.*, No. 88 C 3645 (N.D.Ill., filed May 3, 1988), ¶¶ 9–13, 25–29, 30–32.

The FTC filed a claim against Austin's bankruptcy estate based on the District Court's $1.5 million judgment against Austin. On April 19, 1991, the FTC commenced this adversary proceeding by filing a Complaint seeking a determination that its claim against Austin's bankruptcy estate is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. On September 13, 1991, the FTC moved for summary judgment on its Complaint.

## CONCLUSIONS OF LAW

### Introduction

■ Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt which would otherwise be discharged in bankruptcy is not dischargeable "to the extent obtained by ... false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). In order to establish that a

monetary debt is nondischargeable under § 523(a)(2)(A), a creditor must prove three elements: 1) that the debtor obtained the money through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation; 2) that the debtor intended to deceive the creditor; and 3) that the creditor actually and reasonably relied on the debtor's false representations. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985). The creditor must prove these elements by a preponderance of the evidence. *Grogan v. Garner*, — U.S. —, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

The policy behind § 523(a)(2)(A) is to preserve the Bankruptcy Code's discharge provisions for the benefit of the "honest but unfortunate" debtor. *Grogan*, 111 S.Ct. at 659 (*citing Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). A court charged with determining whether a claim is nondischargeable under § 523(a)(2)(A) must remember, however, that exceptions to discharge should be narrowly construed in order to preserve the debtor's "fresh start" in bankruptcy. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915).

The FTC argues that the $1.5 million judgment against Austin which the District Court entered on January 25, 1991 constitutes a nondischargeable debt under § 523(a)(2)(A). According to the FTC, Austin's judgment debt arose as a result of false representations about the authenticity of certain artworks which Austin made knowingly or recklessly and with an intent to deceive. The FTC further argues that the undisputed facts in this case establish the nondischargeability of Austin's judgment debt and entitle the FTC to summary judgment.

### Standing

Before proceeding to the substantive issues in this case, this Court must first determine whether the FTC has standing to assert the nondischargeability of Austin's judgment debt under § 523(a)(2)(A). The FTC does not seek to recover funds on its own behalf, but rather on behalf of various consumers who were allegedly defrauded by Austin. In addition, the FTC does not seek to establish the three elements of nondischargeability under § 523(a)(2)(A) with respect to itself. In other words, the FTC does not claim that *the FTC* actually and reasonably relied on false representations which Austin made knowingly or recklessly and with an intent to deceive. Instead, the FTC bases its claim of nondischargeability on fraud which was allegedly committed on *various customers* of the Austin Galleries.

The FTC nevertheless does have standing to assert the nondischargeability of Austin's judgment debt under § 523(a)(2)(A). Section 523(c)(1) of the Bankruptcy Code provides that an action to determine nondischargeability of a debt under § 523(a)(2) must be brought by "the creditor to whom such debt is owed." 11 U.S.C. § 523(c). The Bankruptcy Code defines a "creditor" as an "entity that has a claim against the debtor." 11 U.S.C. § 101(10). The Code defines a "claim," as, *inter alia*, a "right to payment, whether or not such right is reduced to judgment." 11 U.S.C. § 101(5). Thus, under § 523(c)(1), the only standing requirement for a party seeking to have a debt declared nondischargeable under § 523(a)(2)(A) is that the party must have a right to receive payment on the debt in question. The FTC meets this requirement. Pursuant to the District Court's judgment on January 25, 1991, and the Consent Decree between Austin and the FTC, the FTC has a right to receive payment on Austin's $1.5 million judgment debt. The FTC therefore holds a claim against the debtor, is a creditor within the meaning of § 101(10), and has standing to bring a claim under § 523(a)(2)(A).

Admittedly, the money which the FTC has a right to receive from Austin is not for the FTC's own benefit. Instead, it is to be placed in a "consumer redress fund" and used to make restitution to customers who were allegedly defrauded by Austin. The FTC is nevertheless a creditor with respect to Austin's judgment debt, for Aus-

tin's obligation to pay runs to the FTC as trustee and administrator of the "consumer redress fund." The District Court order of January 25, 1991, expressly states that Austin is liable *to the FTC* pursuant to the Consent Decree between the parties. In addition, the Consent Decree between Austin and the FTC expressly provides that "Title to all funds and interest in the Austin Galleries Redress Account *shall vest with the FTC* from the date that such funds are deposited into the account." (emphasis added).

At least two bankruptcy courts have agreed that the FTC can be considered a creditor when it has a claim against a debtor based on the debtor's alleged violation of the Federal Trade Commission Act. *See In re Black,* 95 B.R. 819 (Bankr.M.D.Fla. 1989); *In re Evans Products Co.,* 60 B.R. 863 (S.D.Fla.1986). The FTC's status as a creditor is unaffected by the fact that the FTC seeks to recover money on behalf of defrauded consumers rather than on its own behalf. According to the court in *Evans Products Co.,* " 'the United States is a creditor not only with respect to [tax claims] but also with respect to statutory obligations enforceable by a federal administrative agency in the public interest *for the benefit of private parties.' " Evans Products Co.,* 60 B.R. at 868 (quoting 2 Collier on Bankruptcy, ¶ 101.09 (15th ed. 1985) (emphasis added)).

■ In fact, the FTC is the *only* party that can be considered a creditor on a claim arising from a violation of § 5(a) of the Federal Trade Commission Act. The FTC has exclusive authority to bring suit to redress violations of § 5(a) of the Federal Trade Commission Act. There is no private right of action under the Act. *Holloway v. Bristol–Myers, Corp.,* 485 F.2d 986 (D.C.Cir.1973). Thus, the only way in which the Federal Trade Commission Act can be enforced is for the FTC to bring actions against violators in its own name.

Furthermore, the fact that the FTC is not the party who was allegedly defrauded by Austin is irrelevant to the issue of the FTC's standing to bring this action. Admittedly, the court in *Kimzey* asserted that a creditor seeking to have a debt declared nondischargeable under § 523(a)(2)(A) must prove that by knowingly or recklessly making false representations, the debtor intended to deceive the *creditor,* and that the *creditor* actually and reasonably relied on the debtor's false representations. *In re Kimzey,* 761 F.2d at 423. This language might be read to suggest that the creditor who brings a claim for nondischargeability under § 523(a)(2)(A) must prove that it was the party actually defrauded by the debtor. Nothing in the language of § 523(a)(2)(A), however, requires that actions under that section be restricted to parties who were actually defrauded. Section 523(a)(2)(A) provides:

(a) A discharge under [the Bankruptcy Code] does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud. . . .

11 U.S.C. § 523(a)(2)(A). The key to nondischargeability of a debt under § 523(a)(2)(A) is the manner in which the debt was incurred. Section 523(a)(2)(A) contains no express or implied limitation on the persons entitled to bring an action.

In fact, § 523 appears to anticipate that actions for determination of nondischargeability under § 523(a)(2)(A) may be brought by someone other than the person or entity actually defrauded by the debtor. Section 523(c)(2) contains special provisions for a federal depository institutions regulatory agency which brings an action under § 523(a)(2) in its capacity as conservator, receiver, or liquidating agent for an insured depository institution. *See* 11 U.S.C. § 523(c)(2). Such a provision would be meaningless if actions under § 523(a)(2)(A) were limited to persons actually defrauded. In addition, although no courts have discussed the issue at any length, several bankruptcy courts have permitted a person other than the person defrauded by the debtor to bring an action under § 523(a)(2)(A). *See, e.g., In re White,* 130 B.R. 979 (Bankr.D.Mont.1991) (successor to defrauded party permitted to bring action under § 523(a)(2)); *In re Miller,* 112 B.R.

937 (Bankr.N.D.Ind.1989) (insurance company subrogated to rights of defrauded creditor permitted to bring action under § 523(a)(2)); *In re Thompson,* 1989–1 Trade Cas. ¶ 68,438, 1989 WL 53930 (Bankr.C.D.Cal.1989) (Federal Trade Commission permitted to bring action under § 523(a)(2)).

Having found that the FTC has standing to assert the nondischargeability of Austin's judgment debt under § 523(a)(2)(A) of the Bankruptcy Code, the Court now turns to the merits of the FTC's motion for summary judgment.

*Summary Judgment Standards*

Rule 56(c) of the Federal Rules of Civil Procedure, which applies to bankruptcy adversary proceedings pursuant to Bankruptcy Rule 7056, states that a motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The primary purpose of summary judgment is to avoid unnecessary trials in cases where no material factual issues are in dispute. *Wainwright Bank & Trust Co. v. Railroadmen's Fed. Saving and Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986).

The party moving for summary judgment has the burden of establishing the lack of a genuine issue of material fact. *In re Hart,* 130 B.R. 817, 822 (Bankr.N.D.Ind. 1991) (*citing Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir.1984) and *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984)). If the moving party meets this burden, the non-moving party must then respond by setting forth specific facts which demonstrate the existence of a genuine issue for trial. Fed.R.Civ.Pro. 56(e); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983). The party opposing summary judgment may not merely rest upon the allegations and denials in its pleadings. Fed.R.Civ. Pro. 56(e).

When ruling upon a summary judgment motion, a court must consider the entire record, and must draw all reasonable inferences and resolve all factual disputes in favor of the non-moving party. *Mid–State Fertilizer v. Exchange Nat'l Bank of Chicago,* 693 F.Supp. 666, 669 (N.D.Ill. 1988). The court must grant the summary judgment motion unless it finds that the party opposing summary judgment has presented sufficient evidence which, if believed, would allow a reasonable jury to return a verdict for the non-moving party. *Hart,* 130 B.R. at 822 (*citing Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.1987)). Thus, it is not enough for the non-moving party to establish the existence of a factual dispute. The facts in dispute must be *material;* they must have the potential to affect the outcome of the case under the applicable law. *Hart,* 130 B.R. at 822. While the court does not *weigh* the evidence presented with regard to a summary judgment motion, the court must assess the *sufficiency* of the evidence to support a verdict in light of the evidentiary standard of proof that applies to the issue at hand i.e. preponderance of the evidence, clear and convincing evidence, etc. *Hart,* 130 B.R. at 822 (*citing Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.1987)).

*Propriety of Summary Judgment in This Case*

The FTC maintains that Austin has failed to demonstrate the existence of a genuine dispute regarding any material factual issue in this case. The FTC also asserts that the record in this case sets forth undisputed facts sufficient to establish each of the three elements of a claim for nondischargeability under § 523(a)(2)(A). This Court will address the FTC's arguments with regard to each element of its claim *seriatim.*

1. *Did Austin incur the judgment debt through representations which he either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation?*

The FTC asserts that this Court is compelled on three separate bases to find that

the first element of a nondischargeability claim under § 523(a)(2)(A) has been proved in this case. First, the FTC argues that the issue of whether Austin knowingly or recklessly made false representations regarding the authenticity of certain artworks was preclusively settled in the Consent Decree and Stipulation for Judgment between the FTC and Austin. The FTC claims that Austin is therefore precluded from relitigating this issue under the doctrine of collateral estoppel. Second, the FTC claims that in the District Court Memorandum Order dated October 24, 1988, modifying the preliminary injunction restricting Austin's sale of certain art prints, there is a finding that Austin committed fraud in the sale of artworks. The FTC argues that this finding also has preclusive effect under the doctrine of collateral estoppel. Finally, the FTC argues that the application of the law to the undisputed facts in this case establishes that Austin's judgment debt arose through knowing or reckless misrepresentations made by Austin.

This Court finds that the District Court's Memorandum Order of October 14, 1988, has no collateral estoppel effect in the instant proceeding. The Consent Decree and Stipulation for Judgment, however, do operate to preclude Austin from relitigating the issue of whether Austin knowingly or recklessly made false representations. In addition, even if the Consent Decree and Stipulation for Judgment have no collateral estoppel effect, the record contains undisputed facts which establish that Austin knowingly or recklessly made false representations regarding the authenticity of certain artworks.

 a. The Consent Decree and Stipulation for Judgment between the FTC and Austin collaterally estop Austin from litigating the issue of whether he knowingly or recklessly made false representations in the sale of artwork.

 The doctrine of collateral estoppel provides that a factual issue which has been actually and necessarily litigated and finally determined in a prior lawsuit may not be relitigated in a subsequent lawsuit. *Klingman v. Levinson,* 831 F.2d 1292, 1294 (7th Cir.1987) (*citing Brown v. Felsen,* 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979)). The Seventh Circuit Court of Appeals has held that collateral estoppel should be applied to cases in which a court hearing a nonbankruptcy case has finally determined factual issues relevant to a subsequent bankruptcy dischargeability claim using the same standards that a bankruptcy court would have used in determining those issues. *Klingman,* 831 F.2d at 1295. There are four requirements which must be met before collateral estoppel will operate to preclude relitigation of a factual issue in a subsequent proceeding:

> 1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must [have been] fully represented in the prior action.

*Id.* The Consent Decree and Stipulation for Judgment between the FTC and Austin meets all four of the collateral estoppel requirements with respect to the issue of whether Austin knowingly or recklessly made false representations regarding the authenticity of certain artworks.

First, the issue which the FTC seeks to establish through collateral estoppel was resolved in the Consent Decree and Stipulation for Judgment between the FTC and Austin. The Stipulation for Judgment clearly establishes that Austin made false representations. Pursuant to the Stipulation for Judgment, Austin specifically admitted that in "numerous instances," he misrepresented the authenticity and value of the art prints he offered for sale.

 The Consent Decree and Stipulation for Judgment also establish that Austin made these false representations knowingly or recklessly. This issue is not resolved, however, in the way the FTC argues. The FTC argues that Austin's *factu-*

al admissions in the Stipulation for Judgment establish that Austin knew that the representations made about certain artworks were false. A close reading of these factual admissions reveals that the FTC's argument is fallacious. In the Stipulation for Judgment, in addition to admitting that false representations were made, Austin admitted that as president and sole shareholder of Austin Galleries, he directs, controls, formulates, or participates in all aspects of his galleries' operations. Austin also admitted that as a result of his corporate duties and responsibilities, he "knew or should have known" of the false representations being made in connection with the sale of artwork and "failed to act within [his] authority to control such acts and practices." Austin's admission that he "should have known" that false representations were made and "failed to act" to control them indicates that Austin's behavior was at least *negligent.* This admission falls short, however, of establishing that Austin behaved *knowingly* or *recklessly* as required under § 523(a)(2)(A).

A person commits negligent misrepresentation when he or she supplies false information without exercising reasonable care or competence in obtaining or communicating the information. Rest.2d Torts, § 552 (1977). Arguably, saying that a person "should have known" that he or she was disseminating false information is equivalent to saying that the person would have known that the information was false if he or she had exercised reasonable care. Reckless misrepresentation, on the other hand, occurs when a person asserts false information as if it were true in spite of the fact that he or she recognizes a possibility, more or less great, that the information may be false. Rest.2d Torts § 526, comment e (1977). Thus, reckless misrepresentation apparently requires a higher level of awareness of the possible falsity of information than is encompassed in the phrase "should have known." Contrary to the FTC's assertion, the issue of whether Austin made false representations *knowingly or recklessly* was therefore not resolved by Austin's factual admissions in the Consent Decree and Stipulation for Judgment.

The issue of whether Austin's behavior was knowing or reckless rather than merely negligent *was* resolved, however, by other admissions in the Stipulation for Judgment. In addition to containing factual admissions, the Stipulation for Judgment also contained "admissions" of legal conclusions. Specifically, Austin admitted in the Stipulation for Judgment that the false representations made in the sale of certain artworks constituted "unfair or deceptive acts and practices in violation of Section 5(a) of the FTC Act." In addition, he admitted that as a result of these false representations, he was individually liable for unfair or deceptive acts or practices in violation of Section 5(a). By making these admissions, Austin necessarily admitted that he behaved either knowingly or recklessly with respect to the false representations which were made.

Several courts, including the Seventh Circuit Court of Appeals, have noted that bad faith is not an element of an unfair or deceptive act or practice under § 5(a) of the Federal Trade Commission Act. These courts have held that persons or entities who have engaged in deceptive trade practices may be subject to cease-and-desist orders or injunctions requested by the FTC even if they acted in good faith and without intent to deceive. *See, e.g., F.T.C. v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1029 (7th Cir.1988); *Chrysler Corp. v. F.T.C.,* 561 F.2d 357, 363 n. 5 (D.C.Cir. 1977) ("An advertiser's good faith does not immunize it from responsibility for its misrepresentations; intent to deceive is not a required element for a section 5 violation."); *Koch v. F.T.C.,* 206 F.2d 311, 317 (6th Cir.1953) ("The fact that petitioners made the representations in good faith is immaterial. Decision [sic] whether material facts have been misrepresented does not depend upon the good or bad faith of the advertiser."); *Gimbel Bros. v. F.T.C.,* 116 F.2d 578, 579 (2d Cir.1941) ("Whether or not the advertiser knows the representations to be false, the deception of purchasers and the diversion of trade from competitors is the same.... Hence, a deliberate effort to deceive is not necessary to make

out a case of 'using unfair methods of competition' within the prohibition of [§ 5 of the Federal Trade Commission Act]."). On the other hand, in cases in which the FTC has sought to hold an individual director, officer, or shareholder liable for *monetary restitution* based on a corporation's violation of § 5(a) of the Federal Trade Commission Act, the Seventh Circuit Court of Appeals and other courts have required the FTC to establish some degree of bad faith on the part of the defendant. The FTC need not prove that the defendant possessed a subjective *intent* to deceive. The FTC must prove, however, that the defendant had *knowledge* that the corporation or one or more of its agents engaged in dishonest or fraudulent conduct. *F.T.C. v. Amy Travel Service, Inc.*, 875 F.2d 564, 574 (7th Cir.1989); *F.T.C. v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1292 (D.Minn. 1985); *F.T.C. v. International Diamond Corp.*, 1983–2 Trade Cas. ¶ 65,725 (CCH), at 69,707, 1983 WL 1911 (N.D.Cal.1983). The defendant's "knowledge" of the corporation's dishonest or fraudulent conduct may consist of 1) "actual knowledge of material misrepresentations"; 2) "reckless indifference to the truth or falsity of such misrepresentations"; or 3) "an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Amy Travel Service*, 875 F.2d at 574 (*quoting Kitco*, 612 F.Supp. at 1292). The first of these definitions consists of "actual knowledge"; the second and third constitute "recklessness." By admitting that he was

individually liable for monetary restitution based on misrepresentations made in the sale of artwork by Austin Galleries, Austin necessarily admitted that he met all of the elements necessary to establish such liability. Austin therefore necessarily admitted that he had "knowledge" of the misrepresentations as defined in *Amy Travel Service*, which constitutes an admission that he acted knowingly or recklessly with respect to the misrepresentations.

The second and third collateral estoppel requirements are also met in this case. Ordinarily, collateral estoppel operates to preclude relitigation of a factual issue only if the factual issue was "actually litigated" in the prior proceeding, and if the determination of the issue was essential to the final judgment in the prior proceeding. *Klingman*, 831 F.2d at 1295. When the prior proceeding was resolved by consent decree, however, these requirements are modified because issues resolved by consent decree are, by definition, neither litigated nor judicially resolved. *See In re Halpern*, 810 F.2d 1061, 1064 (11th Cir. 1987). The key to determining whether a consent decree collaterally estops a party from relitigating a factual issue resolved therein is whether the parties to the consent decree intended their agreement to have preclusive effect in later proceedings. *Klingman*, 831 F.2d at 1296; *Halpern*, 810 F.2d at 1064; 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4443 (1981).[2]

---

**2.** The *Klingman* court clearly indicated that in cases where a collateral estoppel claim is based on a consent decree, the usual requirement that the issues sought to be precluded from relitigation must have been "actually litigated" in the prior proceeding is satisfied if the parties intended their agreement to have preclusive effect. The *Klingman* opinion contains no discussion, however, of the third collateral estoppel requirement—that determination of the issues sought to be precluded from relitigation must have been essential to final judgment in the prior proceeding. The court simply asserted, without explication, that the requirement had been somehow satisfied:

> Because the consent agreement resolved the same issues that would be litigated in the bankruptcy case and because [the party against whom collateral estoppel was sought to be applied] was fully represented during

the state court proceeding, three of the four requirements for applying collateral estoppel clearly have been satisfied. The only remaining question is whether stipulations entered into as part of a consent judgment satisfy the requirement that the issue be "actually litigated."

*Klingman*, 831 F.2d at 1296 (footnote omitted).

The *Halpern* court was more thorough. The *Halpern* court explicitly stated that when a collateral estoppel claim is based on a consent decree, an inquiry into whether the parties intended the consent decree to have preclusive effect replaces both the inquiry into whether the factual issues sought to be precluded from relitigation were actually litigated, and the inquiry into whether determination of those issues was necessary to final judgment in the prior proceeding. *Halpern*, 810 F.2d at 1064.

In *Klingman,* the Seventh Circuit relied on the consent decree's express language as evidence that the parties intended their agreement to have preclusive effect. The consent decree in *Klingman* specifically stated that "in any subsequent proceedings all of the allegations of the Complaint and findings of this Court may be taken as true and correct without further proof." *Id.* Admittedly, there is no similar language in either the Consent Decree or the Stipulation for Judgment between the FTC and Austin. The *Klingman* opinion does not suggest, however, that such explicit language is required to support a finding that the parties intended their stipulations to have preclusive effect. The Eleventh Circuit Court of Appeals, which has adopted virtually the same requirements for collateral estoppel based on a consent decree as the Seventh Circuit, has stated that the parties' intentions regarding a consent decree's preclusive effect may be discerned through the language in the decree or through "other evidence." *Halpern,* 810 F.2d at 1064.

The circumstances surrounding the entry of the Stipulation for Judgment between the FTC and Austin constitutes "other evidence" that the parties must have intended their stipulations to have preclusive effect. The Consent Decree between the FTC and Austin was entered in April, 1990. This Consent Decree provided, *inter alia,* that Austin would pay the FTC $625,000 "in full satisfaction of all monetary claims asserted by the [FTC]." The Consent Decree therefore terminated litigation of the substantive claim between the FTC and Austin. On the same date, the parties signed the Stipulation for Judgment containing the factual and legal admissions which the FTC argues have preclusive effect in this proceeding. This Stipulation for Judgment was only to take effect, however, if Austin defaulted on his monetary obligations under the Consent Decree. By the terms of the Consent Decree, default could not occur until January 1, 1991, nearly nine months after the FTC and Austin resolved their substantive dispute. Thus, the admissions contained in the Stipulation for Judgment were clearly not intended to have any effect on the original litigation between the FTC and Austin. The only possible purpose the parties could have had for entering the stipulations was to preclude relitigation of certain issues in a subsequent proceeding.

Finally, both parties concede that the fourth requirement for the operation of collateral estoppel is satisfied in this case. The fourth collateral estoppel requirement is that the party against whom estoppel is invoked must have been fully represented in the prior proceeding. Austin acknowledges that he was represented by counsel throughout his prior litigation with the FTC.

 Austin claims, however, that at the time he entered the Consent Decree and Stipulation for Judgment with the FTC, his counsel was threatening to withdraw and he believed he had no choice but to settle. Austin therefore contends that the application of collateral estoppel to preclude him from relitigating issues resolved in the Consent Decree and Stipulation for Judgment would be "unfair." Relying on *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), Austin asks this Court to use its discretion to refrain from applying collateral estoppel in this "unfair" manner.

*Parklane Hosiery* provides no support for Austin's request. The Supreme Court in *Parklane Hosiery* discussed the possible unfairness which may result when a defendant who loses a lawsuit against one plaintiff is thereby collaterally estopped from defending itself in subsequent lawsuits brought by other plaintiffs based on the same factual circumstances. *See Parklane Hosiery,* 439 U.S. at 330–31, 99 S.Ct. at 651. Such unfairness could result in a several ways. For example, if the first lawsuit sought only small or nominal damages, and the defendant reasonably did not foresee the possibility of future lawsuits, the defendant might have lacked incentive to vigorously defend the first lawsuit. *Id.* at 330, 99 S.Ct. at 651. In addition, allowing an unrelated plaintiff to invoke collateral estoppel may be unfair to the defendant if the judgment on which the collat-

eral estoppel claim is based is inconsistent with one or more previous judgments in favor of the defendant. *Id.* Finally, application of collateral estoppel may be unfair to a defendant if the second action would afford the defendant procedural opportunities that were unavailable in the first action. *Id.* at 331, 99 S.Ct. at 651. In light of these possible inequities, the Court gave trial courts broad discretion to deny the use of collateral estoppel to a plaintiff who was neither a party nor in privity with a party to the earlier proceeding on which collateral estoppel is based. *Id.*

The *Parklane Hosiery* holding is inapposite to this proceeding. The FTC, the party which seeks to invoke collateral estoppel in this case, was also the plaintiff in the earlier proceeding on which the collateral estoppel claim is based. None of the potential sources of unfairness which the Court discussed in *Parklane Hosiery* is present in the instant case. In addition, Austin has not convincingly demonstrated the "unfairness" of permitting the FTC to collaterally estop him from relitigating the issue of whether he knowingly or recklessly made false representations regarding certain artworks. Austin does not contend, for example, that he failed to understand the terms of the Consent Decree and Stipulation for Judgment or that he was induced to sign these documents through fraud, duress, or misrepresentation.[3] Austin entered the Consent Decree and Stipulation for Judgment knowingly and voluntarily, and there is no reason for this Court to refuse to give these documents collateral estoppel effect.

 b. The Memorandum Order in which the District Court modified the preliminary injunction against Austin has no collateral estoppel effect.

 ■ The FTC claims that the District Court's Memorandum Order modifying the preliminary injunction against Austin also precludes Austin from relitigating the issue of whether he knowingly or recklessly

made misrepresentations in the sale of artwork. This Court disagrees.

The FTC argues that in the course of modifying the preliminary injunction between Austin and the FTC, the District Court made a finding that Austin engaged in fraud, which necessarily implies that Austin made knowing misrepresentations. It is not clear, however, that the District Court's Memorandum Order contains any conclusive findings of fact regarding Austin's allegedly fraudulent conduct. In its Memorandum Order, the District Court noted that the FTC had presented a great deal of evidence indicating that Austin had misrepresented the authenticity and value of several artworks, and that Austin had failed to refute this evidence. *Federal Trade Commission v. Austin Galleries, Inc., et. al.,* 88 C 3845 (N.D.Ill., filed May 3, 1988), Memorandum Order dated October 24, 1988, at 5. The Memorandum Opinion also refers to "overwhelming fraud *seemingly* revealed" by the FTC. *Id.* (emphasis added). Contrary to the FTC's contention, these statements do not amount to a conclusive finding by the District Court that Austin engaged in fraud.

In addition, even if the District Court *had* found that Austin acted fraudulently, such a finding would have no collateral estoppel effect because it would not have been essential to the District Court's judgment. The FTC argues that the District Court could not have modified the preliminary injunction without making a finding of fraud. This argument is completely contrary to the nature and purpose of preliminary injunctions. The District Court had absolutely no need to decide whether or not Austin engaged in fraud in order to rule on the FTC's motion for modification of the preliminary injunction.

The issue of whether Austin committed fraud related to the merits of the FTC's claim against Austin. A ruling on a preliminary injunction motion, however, is not a ruling on the merits of the underlying

---

3. Consent decrees are essentially contracts between the parties and therefore give rise to standard contract defenses, such as fraud, ignorance, mistake, or mutual breach. *See* CHARLES

A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, 18 FEDERAL PRACTICE AND PROCEDURE § 4443, at 383 (1981).

claim. The purpose of a preliminary injunction to protect the plaintiff from irreparable harm pending the *subsequent* resolution of the case's substantive legal issues. A party seeking a preliminary injunction need not prove its case on the merits. The party need only show that it has *"some likelihood* of succeeding on the merits." *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 387 (7th Cir.1984) (emphasis added). Furthermore, the threshold of "likelihood" which the plaintiff must meet is low; "[i]t is enough that 'the plaintiff's chances are better than negligible.'" *Id.* (*quoting Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 123 (7th Cir.1982)). Because a District Court order granting or modifying a preliminary injunction does not resolve the substantive issues in the underlying case, such an order cannot have collateral estoppel effect with regard to those issues.

 c. The application of the law to the undisputed facts in this case demonstrate that Austin recklessly made false representations regarding the authenticity and value of certain artworks.

 In connection with its motion for summary judgment, the FTC has submitted several evidentiary affidavits purporting to show both that Austin misrepresented the authenticity and value of certain artworks, and that Austin either knew of the misrepresentations or was reckless in not knowing of them. Austin's responsive affidavit creates a genuine issue of fact regarding some of the FTC's allegations. The remaining undisputed facts, however, are sufficient to establish by a preponderance of the evidence that Austin made false representations in the sale of certain artworks, and was at least reckless in making these misrepresentations. Thus, regardless of whether collateral estoppel precludes Austin from relitigating the issue of whether he knowingly or recklessly made false representations, the FTC is entitled to summary judgment on this issue. Austin has not presented sufficient evidence to support a verdict in his favor on this issue, even if all of the evidence is construed in the light most favorable to him.

 i. *The undisputed facts establish that Austin made false representations regarding the authenticity and value of certain artworks.*

The FTC has submitted affidavits of several art experts, art appraisers, and authorities on particular artists who testified that they examined a large number of artworks which were either sold or offered for sale by Austin Galleries. Austin represented these artworks as authentic lithographic prints by Salvador Dali, Marc Chagall, Joan Miró, and Pablo Picasso. The FTC's affiants concluded that the vast majority of the artworks were inauthentic and worth considerably less money than Austin had represented to his buyers and potential buyers. The FTC's experts relied on a variety of techniques in reaching their conclusions. They analyzed the paper on which Austin's artworks were printed, compared the colors and gradations in artworks sold by Austin with works known to be authentic, referred to authoritative catalogues of the given artists' works, and reviewed Austin's purchasing patterns. The FTC also presents affidavits from several customers who purchased artworks from Austin Galleries based on representations that they were authentic and valuable lithographic prints by Dali, Chagall, Miró, and Picasso. The customers testified that after purchasing prints from Austin, they became suspicious about the authenticity of the works and had the works examined by art experts. These experts confirmed that the majority of the prints were inauthentic.

Austin does not dispute the FTC's allegations that many of the artworks he represented as authentic original prints were in fact forgeries or unauthorized reproductions. The undisputed facts therefore establish that Austin made misrepresentations regarding the authenticity and value of certain artworks he offered for sale.

 ii. *The undisputed facts establish that Austin was at least reckless in making false representations regarding the authenticity and value of certain artworks.*

The FTC also has submitted affidavits suggesting that Austin knew or should

have known that false representations were made in connection with the sale of certain artworks. The FTC's affidavits suggest that the circumstances surrounding Austin's purchase and sale of artworks were so suspicious that Austin either must have known, or was reckless in not knowing, that many of his works were inauthentic.

The FTC presents affidavits from several former Austin Galleries employees who testified that while employed at Austin Galleries, they noted a number of irregularities in Austin's purchasing and sales practices. These irregularities caused the employees to doubt the authenticity of several of the artworks offered for sale.

For example, several of the employee-affiants testified that they were suspicious of the fact that Austin apparently had access to a virtually unlimited supply of supposedly limited edition prints. They also noted that the Austin Galleries sometimes acquired prints with duplicate print numbers. One former employee discovered, for example, that Austin Galleries possessed three prints of a particular Picasso title which were all numbered "140/200." Such numbering suggests that all three prints were the 140th print of a 200–print edition, an impossible occurrence. This affiant testified that he observed duplicate print numbers in several other titles as well. Some former employees also testified that they discovered prints with clearly erroneous print numbers, such as a print which purported to be the 151st print of a 150–print edition.

Furthermore, some former employees were suspicious of the fact that the vast majority of Miró prints sold by Austin Galleries were numbered "H.C.," which stands for "hors de commerce" or "outside of commerce." This designation is typically affixed to a small percentage (generally 10–20 percent) of the prints in a given edition and are given to the artist, printer, or dealer to dispose of as they like. Several of the employee-affiants claimed that they discussed their concerns regarding the authenticity of certain artworks with Aus-tin. They believed, however, that Austin failed to respond to their concerns.

The FTC also presents affidavits of its own investigators which contain further evidence of irregularities surrounding Austin's purchase and sale of allegedly authentic lithographs by the artists Dali, Chagall, Miró, and Picasso. For example, like the employee-affiants, FTC investigators discovered that Austin purchased and sold a number of Dali, Picasso, and Miró prints with duplicate print numbers. These duplicate print numbers are strong evidence that the artworks to which they are attached are not authentic.

In addition, the FTC confirmed that Austin had purchased and sold a suspiciously large number of supposedly limited edition prints. Within $3\frac{1}{2}$ years, Austin purchased 148 prints of a Picasso title allegedly limited to 200 prints. During the same $3\frac{1}{2}$–year period, Austin purchased 126 prints of another Picasso title and 124 prints of a third Picasso title, both of which were allegedly limited to 200 prints. In fact, Austin was apparently able to obtain specific titles of allegedly limited edition Picasso prints virtually on demand. Austin frequently sold Picasso prints on a "TBO" or "to be ordered" basis, meaning that he accepted orders for prints he did not own at the time of sale and acquired the prints in time to deliver them to the customer. Austin guaranteed delivery of "TBO" orders in four to six weeks. Austin purchased the majority of his Picasso prints from a single supplier.

Austin also purchased large quantities of "limited edition" Chagall prints from the same supplier. Austin often purchased four to six prints of the same Chagall title in a single transaction, despite the fact that these Chagall prints were of editions allegedly limited to 40–90 prints. Several of the FTC's witnesses noted the unlikelihood that Austin could so easily obtain such a large number of authentic limited edition prints, particularly in such a short time period and through a single source.

The FTC's investigators also testified that a seemingly disproportionate number of the Miró prints which Austin sold were

designated "H.C.," a designation typically reserved for only 10–20 percent of the total prints in an edition. In a period of approximately 2½ years, Austin sold 34 "H.C." prints of a single Miró title. The entire edition of this title consisted of only 200 prints. Similarly, during the same 2½-year period, Austin sold 11 "H.C." prints of a Miró title with an edition size of 75 prints, and 25 "H.C." prints of a third Miró title with a total edition size of 90. It is unlikely that Austin could have obtained so many of these relatively rare "H.C." prints within such a short time period if the prints were authentic. An even more suspicious circumstance noted by the FTC investigators is that Austin occasionally sold more "H.C." prints of a given Miró title than were generally believed to exist. For example, Austin sold 10 "H.C." prints of the title "Lune Blue" even though the certificate of authenticity which Austin received from his supplier indicated that only 5 "H.C." prints of this title exist. In addition, Austin sold 8 "H.C." prints of the title "La Captive" despite the fact that the supplier's certificate attested to the existence of only 5 "H.C." prints.

In response to the FTC's evidence, Austin submits an affidavit denying that he knew or had reason to know that any of the artworks which he represented as authentic lithographic prints by Dali, Chagall, Miró, and Picasso were not authentic. Austin also denies that the former employees whose affidavits were submitted by the FTC had ever expressed doubts to him regarding the authenticity of artworks offered for sale in the Austin Galleries.

On the other hand, Austin does not dispute the accuracy of the FTC's evidence regarding the number of prints of various titles he has purchased, the suppliers from whom he purchased, or the dates on which he made purchases. In addition, Austin does not dispute the FTC's evidence that he has purchased and sold artworks with duplicate print numbers. Austin responds to the FTC's allegations regarding these matters simply by asserting that he did not believe there was anything unusual about the quantity of prints he was able to purchase. Austin maintains that he relied on information he received from his suppliers when representing artworks as authentic lithographic prints by the named artists. Austin claims that he never sold a piece of artwork without first obtaining a certificate of authenticity from his supplier. Austin further maintains that the suppliers he relied upon were commonly used throughout the retail art industry.

The undisputed evidence does not support a conclusion that Austin knowingly made false representations regarding the authenticity and value of certain artworks sold in his galleries. Austin asserts in his affidavit that he subjectively believed that the representations he made about the artworks he offered for sale were true. In addition, although the FTC has submitted evidence that several former Austin Galleries employees called Austin's attention to the highly suspicious nature of certain artworks, such as works bearing duplicate or erroneous print numbers, Austin claims that these employees never discussed such matters with him. When ruling on a summary judgment motion, a court must view all evidence in the light most favorable to the non-movant. For purposes of this summary judgment motion, therefore, this Court must accept as true Austin's assertions that he had no actual knowledge of the falsity of the representations he made about particular artworks.

The undisputed evidence *does* support a conclusion, however, that Austin was at least reckless in not knowing that many of the artworks sold in his galleries were inauthentic. Austin's corporate functions and duties made him ultimately responsible for determining the authenticity of all artworks sold. Austin was the president and sole owner of Austin Galleries. In that capacity, he was responsible for selecting the artwork that was purchased and offered for sale in the Austin Galleries and for selecting the galleries' suppliers. Austin also authorized or directed the preparation of, and signed, the certificates of authenticity and letters of valuation that were provided to customers. Any failure to detect the inauthenticity of artworks offered

for sale in the Austin Galleries can therefore be attributed directly to Austin.

Austin claims that his failure to detect the inauthenticity of the art prints was not reckless because he relied on representations and certificates of authenticity he received from his suppliers. He asserts that such reliance was reasonable because his suppliers were commonly used throughout the retail art industry. In spite of Austin's assertions, however, his reliance on the representations of his suppliers was not reasonable in light of the overwhelming and undisputed evidence of highly suspicious circumstances surrounding Austin's purchasing and sales patterns. Austin does not deny that he purchased large quantities of allegedly limited edition prints within relatively short periods of time. In some cases, the number of prints he purchased of a single title amounted to over 60% of the total edition size. In addition, Austin does not dispute that he had relatively easy access to these allegedly limited edition prints. He often purchased four to six prints of a single title in one transaction, and sold prints on a "to be ordered" basis with delivery guaranteed in four to six weeks. Finally, it is undisputed that Austin purchased and sold many prints bearing duplicate print numbers, a strong indication of inauthenticity. These circumstances were so suspicious that Austin was at least reckless in not taking additional steps, beyond relying on the representations of his suppliers, to confirm the authenticity of the artworks he purchased.

Austin's failure to make further inquiry into the authenticity of the artwork he purchased for sale in his galleries was particularly imprudent considering the nature of the retail art business. The authenticity of a particular work of art largely determines its value. Authentic lithographic prints by well-known artists such as Dali, Chagall, Miró, and Picasso can be worth hundreds or thousands of dollars, while inauthentic reproductions of works by these artists may be worth no more than $50. In addition, retail art purchasers frequently lack expertise in the field of art and rely upon representations of authenticity made by art gallery employees. Given the significance of authenticity in the art business, Austin's failure to independently investigate the authenticity of the artworks he purchased, despite the highly suspicious circumstances surrounding their purchase, was reckless at the very least.

2. *Did Austin make misrepresentations with an intent to deceive?*

The second element which a creditor must prove in order to establish that a debt is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code is that the debtor made false representations with scienter, or an intent to deceive. *Kimzey,* 761 F.2d at 423. The Seventh Circuit Court of Appeals has held that an intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to advance money to the debtor. *Id.* at 424. Under this standard, the undisputed facts in this case establish that Austin made misrepresentations with an intent to deceive.

As discussed above, the evidence in this case clearly establishes that Austin made false representations in the sale of certain artworks. In addition, these representations clearly were of a nature that would induce Austin's customers to advance money to Austin. Austin represented inauthentic reproductions or outright forgeries as authentic lithographic prints by the artists Dali, Chagall, Miró, and Picasso. The FTC's experts testified that the inauthentic works sold by Austin are worth no more than $50 each. Austin does not dispute this valuation. Austin's customers, however, paid several hundred or several thousand dollars for these works. Given the importance of authenticity in determining the value of artwork, Austin must have known that false representations of authenticity would induce customers to pay more money for artworks than they otherwise would be willing to pay. Austin therefore made his misrepresentations with scienter, as defined by the court in *Kimzey.*

3. *Did Austin's customers actually and reasonably rely on Austin's false representations?*

The third element of a claim for nondischargeability under § 523(a)(2)(A) is that

the creditor must actually and reasonably have relied on the debtor's false representations. The undisputed facts in this case establish this final element of the FTC's claim.

The Seventh Circuit has held that actual reliance may be proved by circumstantial evidence of reliance. *In re Kreps,* 700 F.2d 372, 375 (7th Cir.1983). The circumstantial evidence in this case strongly indicates that Austin's customers actually relied on his false representations when purchasing art from the Austin Galleries. As noted above, Austin's customers paid Austin anywhere from several hundred to several thousand dollars for artworks which were worth no more than $50. The only reasonable explanation for this behavior is that the customers relied upon Austin's claim that the works were authentic lithographic prints by the named artists.

Furthermore, the customers' reliance on Austin's misrepresentations was reasonable. Retail art customers frequently lack expertise in the field of art. In addition, they generally do not have the opportunity to have an artwork examined by an independent expert or appraiser before making a purchase. They are therefore compelled to rely on representations of authenticity made by art gallery employees. Such reliance is particularly reasonable when the art gallery certifies in writing that a particular artwork is authentic. Austin Galleries not only made oral representations of authenticity to potential customers, but also provided customers with certificates of authenticity and letters of valuation for the artworks they purchased. It was reasonable for customers to rely upon these documents.

In summary, the undisputed facts in this case support the FTC's claim that Austin's judgment debt is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. The FTC is therefore entitled to summary judgment on its Complaint for a determination of nondischargeability. The final issue which must be addressed is the amount of the $1.5 million judgment which qualifies for nondischargeability under § 523(a)(2)(A).

*Amount of Debt Nondischargeable Under § 523(a)(2)(A)*

Section 523(a)(2)(A) provides that a debt is nondischargeable *"to the extent obtained by ...* false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2)(A) (emphasis added). Several courts have interpreted the emphasized language as providing that nondischargeability under § 523(a)(2)(A) is limited to the portion of a debt which is *directly attributable* to a false representation or fraud. *See, e.g., In re Levy,* 951 F.2d 196, 198 (9th Cir.1991); *Matter of Larson,* 79 B.R. 462, 465 (Bankr.W.D.Mo.1987); *Matter of Suter,* 59 B.R. 944, 946–47 (Bankr. N.D.Ill.1986). It is unclear in the instant case whether the entire $1.5 million judgment against Austin can be attributed to Austin's false representations to customers. The original consent decree between the FTC and Austin provided that Austin would pay $625,000 into a consumer redress fund in "full satisfaction of all monetary claims" asserted by the FTC. Austin became liable in the amount of $1.5 million only when he "defaulted" by failing to make full payment under the consent decree by a specified date. Thus, the difference between the $1.5 million due upon default and the $625,000 originally due under the consent decree may be classified as a penalty for failure to make timely payment rather than as a debt attributable to Austin's false representations.

Because the parties have not briefed the issue of the amount of Austin's judgment debt which may be held nondischargeable under § 523(a)(2)(A), this Court declines to decide the issue at this time. The parties are directed to brief this issue in accordance with the briefing schedule set forth the order issued concurrently with this Memorandum Opinion.