In re Kenneth R. EVERSOLE, Debtor.

BEVERLY ENTERPRISES, Plaintiff,

v.

Kenneth R. EVERSOLE, Defendant.

Bankruptcy No. 2–87–05059.
Adv. No. 2–88–0034.

United States Bankruptcy Court,
S.D. Ohio, E.D.

Feb. 6, 1990.

Alexander M. Andrews, Ulmer & Berne, Cleveland, Ohio, for plaintiff.

Charles W. Ewing, Charles W. Ewing Co., L.P.A., Columbus, Ohio, for debtor/defendant.

Charles M. Caldwell, Asst. U.S. Trustee, Office of the U.S. Trustee, Columbus, Ohio.

## AMENDED OPINION AND ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

R. GUY COLE, Jr., Bankruptcy Judge.

This matter is before the Court following the trial of a complaint filed by Beverly Enterprises to determine the dischargeability of a debt owed it by the debtor. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this judicial district. This is a core proceeding which the Court may hear and determine in accordance with 28 U.S.C. § 157(b)(1) and (b)(2)(I). The following opinion and order shall constitute the Court's findings of fact and conclusions of law.

### I. *Statement of Facts*

Debtor, Kenneth R. Eversole ("Debtor"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code on November 10, 1987. Pursuant to a joint agreement between the United States Trustee and the Debtor, his Chapter 11 case was converted to a case under Chapter 7 of the Bankruptcy Code on November 15, 1988.

In November 1984, Debtor and Bryson Hill, a real estate developer specializing in the acquisition and construction of nursing homes, completed construction of a health care facility in Adrian, Michigan. Debtor and Hill, operating as joint venturers, sold the facility to plaintiff, Beverly Enterprises ("Beverly"), at a closing which took place on December 1, 1984, at the law offices of Debtor's counsel, Benesch, Friedlander, Coplan & Aronoff ("Benesch, Friedlander") in Columbus, Ohio. Although this was the first purchase-sale transaction between these parties, Debtor and Hill were reputed to be qualified developers and operators of nursing home facilities.

John Todd, Beverly's director of acquisitions, and James Pietrzak, its in-house

counsel, represented Beverly at the closing. At some point during or after the closing, Hill mentioned to Todd and Pietrzak that he and Debtor had obtained a certificate of need to build a 240–bed nursing home in Bayonne, New Jersey, to be named Hanover House. A certificate of need is a permit granted by a governmental authority—in New Jersey, by its Department of Health—after an often-lengthy and competitive application process. The certificate of need allows its holder to build and operate a specified nursing home facility subject to the terms and conditions set forth in the certificate. It was described at trial as a "valuable document" in the nursing home construction industry, without which development and construction may not proceed. The application itself had been prepared and submitted principally by a Joseph Newman with the assistance of the Debtor. Hill's role was to obtain financing for construction of the facility, while Debtor was to oversee actual construction.

Hill believed that Hanover House would be constructed by a partnership known as Hanover House Associates, in which he and Debtor would serve as the two partners. He understood that Newman was an associate of Debtor's, either on a contractual basis or as an employee, whose duties were directed at obtaining the certificate of need. Hill did not know that Newman would be involved in the project on a long-term basis or that he would be a partner in Hanover House Associates.

Debtor had represented himself to Beverly as an experienced developer and operator of nursing homes. The Court is independently aware that Debtor owned, or was the principal shareholder in, Health Resources Development, a holding company which held a number of corporations. These corporations, in turn, owned and operated nursing homes. A number of these corporations sought relief in this Court under Chapter 11 of the Bankruptcy Code as did a related enterprise known as Health Resources Management Corp. Each of these Chapter 11 debtor's cases was converted to Chapter 7 of the Bankruptcy Code due, in large part, to the absence of any real effort to reorganize. Debtor also

owned International Construction Corp. ("ICC"), which operated as the construction arm of Debtor's development operations. Additionally, Debtor, with his wife, held all the stock in Old Sales Farms, Inc., which owned and boarded horses. Debtor's businesses employed a full-time staff of employees, including a pilot for the companies' airplane.

Plaintiff is, and was in 1985, a publicly-held company which owns, operates, leases and manages nursing homes. Between 1980 and 1986, its portfolio of nursing homes more than doubled, from approximately 400 to over 1,000. Pietrzak today is a vice-president of Beverly. In 1985, Beverly was very busy, deals moved quickly, and as Pietrzak testified, "it was nuts." (Tr. 119)

Debtor and Hill had previously determined that they needed outside financial support to build Hanover House. When Hill asked Todd and Pietrzak if Beverly would be interested in buying Hanover House—and thereby providing the financing for its construction—Beverly immediately responded in the affirmative. At that time, Beverly was in the midst of an intense growth phase, fueled largely by the acquisition of nursing homes.

The parties met subsequently in Atlanta, Georgia, to discuss details of their proposed transaction. They met again in February 1985 in Nashville, Tennessee, to discuss the matter in further detail. Beverly believed, as did Hill, that Hanover House Associates was a partnership composed only of Hill and Debtor. It was later that Todd, Pietrzak—and even Hill—learned that Newman was a partner or was purported to be a partner. The parties eventually reached an agreement whereby Beverly would purchase Hanover House for the cost of construction ($5.7 million), the cost of land ($3.1 million), and a $610,000 profit to Hanover House Associates. ICC would be paid $300,000 for certain construction-related services, apparently from the $610,000 fee. The parties' attorneys began drafting a purchase-sale agreement and related documents, and continued ne-

gotiating various aspects of the transaction on behalf of their respective clients.

On March 26, 1985, Debtor telephoned Todd and said he needed $100,000. The money was wired into Benesch, Friedlander's trust account on March 29, 1985, and then into Debtor's personal account at BancOhio National Bank, which at the time was overdrawn. Within 30 days, Debtor had spent the entire $100,000 to satisfy personal obligations, such as his credit cards, utility bills, debts of Old Sales Farms, and an unidentified obligation of ICC. None of the $100,000 was applied to the Hanover House project.

The parties' dispute centers upon the $100,000 loan. Todd specifically remembers that Debtor called him on March 26, 1985, and requested an advance of $100,000 to pay project-related architectural and engineering fees. Todd conveyed Debtor's request to Pietrzak, who had just flown from his office in Florida to Beverly's corporate offices in Pasadena, California. Pietrzak also spoke with Debtor by telephone. He, too, claims that the Debtor expressed an urgent need for $100,000 to pay architectural fees of approximately $88,000 and engineering fees of some $12,000. According to Pietrzak, this request was plausible because of the rigid timetables and requirement for continuous construction set forth in the certificate of need. Debtor said he needed the $100,000 before March 31, 1985, or the project would be stalled and the certificate of need endangered. Debtor also told Todd and Pietrzak said that he and Hill would sign promissory notes and partnership pledge agreements as security for their obligations under the $100,000 loan. For this reason, Pietrzak recommended to Beverly's chief financial officer that Beverly approve the loan request. The request was approved and Beverly scrambled to get the money to Debtor by March 29. Beverly claims that Debtor's representations were false and fraudulent and that, as a result, the debt to Beverly should not be discharged.

Debtor claims that he never mentioned architectural or engineering fees in his conversations with Todd and Pietrzak. How-

ever, Hill's deposition, admitted into evidence by the agreement of the parties, supports the testimony of Todd and Pietrzak. Hill says that Debtor told him there were architectural and engineering fees due for which he intended to request a $100,000 advance from Beverly. Hill, accepting Debtor's representations, advised Debtor that he would review a promissory note for the $100,000 "and if it looked okay, then we'd deal with it." (Hill Tr. 18) However, Hill believed the $100,000 was to be used to satisfy the afore-described project-related expenses and was very upset when he learned that Debtor had obtained the advance and used it to pay his personal debts.

In obtaining the advance, Debtor agreed, without consulting Hill, to reduce the partnership's profit from $610,000 to $510,000. This purported agreement of the partnership was very disturbing to Hill. Beverly claims that the arrangement called for Debtor to pay back the $100,000 loan with interest, but that if the project were successfully completed the note or notes would be cancelled and the partnership's profit simply reduced by $100,000. Debtor believes that he was obligated to repay the note and that the profit would be reduced by an additional $100,000. Debtor's promissory note and pledge agreement to Beverly are dated March 29, 1985, but apparently were not signed by him until April 1, 1985. Hill refused to sign a note or pledge agreement because the $100,000 was used by Debtor to pay his personal debts, not the debts of the partnership as represented.

Debtor's recollection of the telephone conferences with Todd, Pietrzak and Hill differs greatly from theirs. Initially, when called upon cross-examination, Debtor testified as follows:

Q. Did you tell Beverly what you needed the money for?

A. Yes, I told them I had bills to pay.

Q. What bills did you tell them that you had to pay?

A. I didn't say.

Q. Did you tell them they were partnership bills?

A. No.

Q. Did you tell them they were personal bills?

A. No.

Tr. 35. Subsequently, in his case-in-chief, Debtor's testimony on direct examination regarding his telephone conversations with Todd and Pietrzak was as follows:

Q. In your conversations with Beverly, who else did you talk to besides Mr. Todd?

A. Mr. Pietrzak.

Q. You heard both of them testify today that you specifically said you were going to pay partnership bills.

Can you tell the Court what you said?

A. Yes. I told them I had to pay personal bills, personal bills and expenses.

Tr. 187. Thus, Debtor has testified in one instance that he *did not* identify that the bills were personal obligations and in a later moment claims that he *did* identify the bills as personal. Debtor continues by saying that March 29, 1985, was simply an "artificial" date he picked, that he never told Todd or Pietrzak it was the deadline for paying certain project-related expenses. Debtor made no effort to explain Beverly's conceded rush to get the money to him.

The bankruptcy court, as a trial court, must assess the credibility and demeanor of the witnesses under the totality of the facts presented. In the case *sub judice*, Debtor's testimony simply is not credible. This is not to say that Debtor has perjured himself; it is possible, perhaps, that he believes his testimony is truthful. However, his version of the events in question is at odds with the manifest weight of the evidence. In simple, his testimony is implausible.

On the other hand, the testimony of Todd, Pietrzak and Hill is credible. It is consistent with the facts adduced at trial and the evidence as a whole. Thus, the Court finds that the Debtor specifically represented to Beverly that Hanover House Associates urgently needed $100,000 to pay architectural and engineering fees for the Hanover House project, otherwise the project would be stalled. In reliance upon the Debtor's representations, Beverly wired the money to him. Beverly would not have lent $100,000 to Debtor for payment of personal obligations nor have moved so expeditiously unless it had been told by Debtor that the $100,000 had to be paid to architects and engineers so that the project would continue.

The urgency of the request and Beverly's rapid internal growth caused Beverly to document the transaction sloppily. The note which Debtor ultimately signed is in his personal capacity and makes no reference to it being a partnership debt. Likewise, the stock pledge agreement which he signed makes no reference to a partnership obligation; it simply pledges Debtor's interest in the partnership as security for Debtor's obligations under the $100,000 note. Nevertheless, it is abundantly clear that Beverly thought it was advancing $100,000 to the partnership for payment of project-related expenses; but even if Beverly thought it was lending $100,000 to Debtor individually, it clearly believed the money was to be used to pay the architects and engineers on the Hanover House project. Under either scenario, Debtor obtained the $100,000 loan by false representations and false pretenses.

After Debtor obtained and spent the $100,000 loan, disputes developed among the three partners of Hanover House Associates. Hill learned of Newman's purported partnership interest, other problems developed, and the partnership became immobilized. The nursing home was never built and Beverly was not repaid its $100,000.

Beverly sued Debtor and his purported partners in the United States District Court for the Northern District of Ohio on January 16, 1986, to recover $100,000 owed under its note. The case was settled with the Debtor by an agreed judgment of September 29, 1987, pursuant to which the Debtor agreed to pay Beverly specific amounts of money on a designated payment schedule. The settlement agreement provided further that if Debtor did not comply with its terms, he would be liable thereunder for the total sum of $150,000. Debtor defaulted under the judgment entry and thus became liable in the sum of $150,000. He

subsequently reduced his liability to $145,-000 by making a payment of $5,000.

On February 11, 1988, Beverly filed the instant adversary proceeding, seeking this Court's determination that Debtor's debt of $145,000 is nondischargeable by virtue of 11 U.S.C. § 523(a)(2)(A). Plaintiff answered the complaint and the matter was tried on December 7, 1989. Beverly filed a trial brief on December 7, arguing that Debtor had embezzled the $100,000 and, as such, should not be able to discharge the debt pursuant to 11 U.S.C. § 523(a)(4). The trial brief was the first assertion by Beverly of entitlement to relief under § 523(a)(4).

## II. *Legal Discussion*

■ Beverly requests that the Court enter a judgment pursuant to 11 U.S.C. § 523(a)(2)(A), excepting from discharge the debt incurred by the $100,000 advanced on March 29, 1985, and the subsequent judgment entry of September 29, 1987. 11 U.S.C. § 523(a)(2)(A) states, in relevant part, as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition . . .

In an action brought pursuant to § 523(a)(2)(A), the plaintiff must demonstrate by clear and convincing evidence that the debtor incurred the debt by false pretenses, false representations, or actual fraud. *Coman v. Phillips (In re Phillips)*, 804 F.2d 930 (6th Cir.1986). In *Phillips*, the Sixth Circuit Court of Appeals specified the following five criteria which must be satisfied in order to establish that a challenged debt is nondischargeable: (1) a representation was made by debtor that was material, (2) the representation was false or was made with gross disregard as to its truth, (3) the debtor intended to deceive, (4) the creditor reasonably relied on the false representation, and (5) the creditor suffered a loss. *Phillips*, 804 F.2d at 932.

■ The clear and convincing standard of proof is an intermediate standard which requires that the plaintiff establish a fact to a lesser degree than beyond a reasonable doubt, but to a greater degree than by a mere preponderance of the evidence. Precisely stated, clear and convincing evidence consists of evidence which implants in the mind of the trier of fact "a firm belief or conviction as to the allegations sought to be established." *Hagedorn v. First Nat'l Bank (In re Hagedorn)*, 25 B.R. 666, 668 (1982); *Hobson v. Eaton*, 399 F.2d 781, 784 n. 2 (6th Cir.1968); *cert. denied*, 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969). Although intent to deceive must be proven by clear and convincing evidence, appropriate proof of such intent may be inferred from circumstantial evidence and implausible testimony. *First Nat'l Bank v. Kimzey (In re Kimzey*, 761 F.2d 421, 424 (7th Cir.1985).

■ In keeping with the purpose of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed in favor of the debtor. *Eisen v. Linn (In re Linn)*, 38 B.R. 762 (9th Cir.B.A.P.1984); *Lake County Dept. of Welfare v. Marino (In re Marino)*, 29 B.R. 797 (N.D.Ind.1983). The exceptions to dischargeability must be narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code. *Financial Collection Agencies v. Norman (In re Norman)*, 25 B.R. 545 (Bankr.S.D.Cal.1982). This is done to effectuate the fresh start policies of the Bankruptcy Code. *Congress Financial Corp. v. Levitan (In re Levitan)*, 46 B.R. 380 (Bankr.E.D.N.Y.1985); *ITT Diversified Credit Corp. v. Nicoll (In re Nicoll)*, 42 B.R. 87 (Bankr.N.D.Ill.1984).

The evidence adduced at trial established that Debtor made a material representation to Beverly by requesting a loan of $100,000 to pay project-related architectural and engineering fees. That representation was false and was made with false pretenses inasmuch as there were no such costs due. The Debtor clearly intended to deceive Bev-

erly in that he had no intention to pay architectural and engineering fees; in fact, such fees were a cost covered by the $5.7 million construction ceiling to be paid by Beverly. Debtor intended to, and in fact did, spend the entire $100,000 loan in satisfaction of personal debts. To be sure, he has not admitted any such intent, but this fraudulent intent may be inferred from the evidence as a whole.

An intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan (or otherwise part with property or services). *First Nat'l Bank v. Kimzey,* 761 F.2d 421, 424 (7th Cir.1985). A "false pretense" involves an implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation," which is an express misrepresentation. *Howard & Sons, Inc. v. Schmidt (In re Schmidt),* 70 B.R. 634, 640 (Bankr.N.D.Ind.1986); *Minority Equity Capital Corp. v. Weinstein (Matter of Weinstein),* 31 B.R. 804, 805 (Bankr.E.D.N. Y.1983). The finding of fact as to whether or not the Defendant had a fraudulent intention will obviously have to be determined by circumstantial evidence in most cases as direct evidence of the Defendant's state of mind at the time of the loan, or the transfer of property or services, is seldom expressly indicated. Although this is certainly a difficult task, it is no greater a task than any other cause of action that includes intent or state of mind as a necessary element. And the existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates he intended to deceive or cheat the creditor.

Some courts have found no reliance requirement under § 523(a)(2)(A). *See e.g. Thul v. Ophaug (In re Thul),* 16 B.C.D. 468, 469, 827 F.2d 340 (8th Cir.1987); *Mechanics and Farmers Savings Bank v. Fusco (In re Fusco),* 14 B.R. 918, 922 (Bankr.D.Conn.1981). However, the Sixth Circuit Court of Appeals in *Phillips* has expressly included reliance as a necessary element to a § 523(a)(2)(A) case. *Coman v.*

*Phillips,* 804 F.2d at 932. Here, Beverly clearly relied upon Debtor's false pretenses and representations regarding the intended use of the $100,000 advance. Had either Todd or Pietrzak been advised of Debtor's actual intent with respect to the loan, Beverly would not have lent the money to the Debtor or the partnership. Beverly's reliance was reasonable under the circumstances given the project's requirement for continuous construction and Debtor's representation that the certificate of need could be lost if the $100,000 loan was not advanced to him within a five-day period of his call.

Beverly suffered a loss of $100,000, exclusive of unpaid interest charges, by reason of Debtor's nonpayment of the loan. Beverly has suffered an additional loss, now totaling $145,000, exclusive of interest charges, by Debtor's nonpayment of a default amount set forth in the aforementioned district court judgment. Accordingly, the evidence overwhelmingly establishes that Beverly has met the criteria for relief under 11 U.S.C. § 523(a)(2)(A), as further expounded by the Sixth Circuit Court of Appeals in *Phillips.* *Id.*

The remaining question, and initially the most difficult hurdle for the Court in its analysis, is whether Beverly has proven its case by clear and convincing evidence. To be sure, Beverly's documentation of the $100,000 loan to the partnership was imperfect. The note which Debtor's lawyers prepared, and which Beverly reviewed, makes no mention or reference of a loan to Hanover House Associates; it is a note from Beverly to Debtor individually. Moreover, Beverly's reliance on Debtor's representation that Hill agreed to the loan and would sign a note and partnership pledge, its failure to confirm the very existence of the partnership or the number and identity of other partners, and its failure to obtain approval of the partnership for the loan, all evidence poor business practices on Beverly's part. Beverly's inattention to detail is not surprising, however, when one considers its status in 1985. Beverly was the "darling of Wall Street," according to Pietrzak, and acquisitions were moving

fast and furiously. (Tr. 119) Pietrzak and his colleagues were working on as many as 30–40 acquisitions at once. In this instance, Pietrzak was away from his office in Florida when the Debtor made the request, and was forced to assess the request with Todd and his superiors under severe time constraints.

Beverly's inability to practice more prudent business practices may be explained, to a great degree, by the nature of the process involving the construction of a nursing home. Obtaining a certificate of need is no easy matter; once awarded, it is a license or protective franchise. It permits the applicant to build the facility described in the application. However, the successful applicant must periodically prove to the state that it is complying with the specific timetables set forth therein. Beverly clearly believed, because Debtor told its representatives, that the project would be stalled if the architects and engineers were not paid nearly $100,000 on or before March 31, 1985. March 29 was a Friday, according to Pietrzak, and thus the last business day of the month for Beverly to transact business with Debtor. Having practiced privately for two years in the certificate of need area, Pietrzak appreciated the dangers posed by missing certain prescribed deadlines. Considering the totality of the circumstances, including the "urgency" generated by the Debtor, it is understandable that Beverly acted in haste and without covering each and every base.

Has Beverly proven its case by clear and convincing evidence? The answer is yes. The evidence, except for Debtor's testimony, demonstrates that Debtor told both Todd and Pietrzak that he and the partnership needed $100,000 to pay its architects and engineers. Even Debtor's partner, Hill, confirms this fact. It strains credulity to suggest, as Debtor has, that Hill would bind himself under a note and stock pledge for a $100,000 personal loan to the Debtor. It would make no sense for Hill to obligate himself for Debtor's personal debts, and he adamantly denies that he ever said he would do so. It makes no sense either that Hill would tell Debtor that the $100,000 had been paid and that Debtor would simply rely on this alleged representation. Many other aspects of Debtor's story, too many to mention, just do not stand up to the most superficial scrutiny.

Having examined Debtor's demeanor and conduct as a witness, including his evasiveness in answering numerous questions, the Court is convinced that his testimony is not credible. It is, simply put, implausible in the face of all of the other facts. The change in his testimony, from saying first that he did not mention the request was for personal bills to saying it was, confirms the Court's analysis. Todd and Pietrzak, on the other hand, were credible witnesses, and Hill's testimony, taken by telephonic deposition, essentially conforms with their recollections and the weight of the evidence. Thus, having viewed the record as a whole, the Court has a firm belief and conviction that the allegations of the complaint have been established.

There are several housekeeping matters which this opinion addresses. First, the Court must resolve two objections raised by Debtor's counsel. One objection concerns certain testimony set forth at page 30 of Hill's deposition. The Court concurs that the answer is tainted by hearsay testimony and the objection is therefore sustained. Second, the Court finds that Plaintiff's Exhibit No. 32 is not within the business records exception to the hearsay rule, as asserted, and the objection to its admission likewise is sustained. All testimony regarding Exhibit No. 32 and any alleged statements attributed to Newman (see Tr. 141–45) are hereby stricken from the record as inadmissible hearsay. Third, Debtor is permitted, pursuant to Rule 7015(b), to amend his answer to paragraph 14 of the complaint to conform to the evidence. And, finally, no relief was sought under § 523(a)(4) nor was entitlement to relief under that Code section established at trial.

Based upon the foregoing, Beverly's claim of $145,000, exclusive of allowable interest charges, is found to be nondischargeable under 11 U.S.C. § 523(a)(2)(A).

Judgment is rendered in Plaintiff's favor and against the defendant.

IT IS SO ORDERED.