*630
 
 FLAUM, Circuit Judge.
 

 City National Bank of Florida (“City National”) sought to hold non-dischargeable the debt owed to it by Robert Sheridan, the bankruptcy petitioner, as a consequence of unrepaid loans. City National contended that Sheridan obtained the underlying loans through the submission of false financial statements and under false pretenses. 11 U.S.C. § 523(a)(2)(A), (B). The bankruptcy court directed a verdict for Sheridan at the end of City National’s case, a decision the district court affirmed. We also affirm.
 

 I.
 

 Robert Sheridan, a developer and manager of commercial and multi-family real estate in Illinois, Florida, and New York, had been involved in the real estate business for over eighteen years. He conducted his business under the names Robert Sheridan & Partners and the Edgemont Corporation. In 1988, Sheridan met with executives from City National to discuss borrowing money for short-term financing of earnest money deposits on property he sought to purchase. On December 29, 1988, Sheridan submitted to City National an August, 1988 financial statement listing his net worth at approximately $29 million. Sheridan testified that he intended City National to rely on the statement in determining whether to extend him financing. The statement had been compiled in the same form, using the same methodology, as financial statements Sheridan had previously produced and had regularly submitted to other financial institutions and third parties. City National’s Executive Vice President in Charge of Lending and Chairman of its lending committee, G. Craig Young, reviewed the statement and asked Sheridan several questions regarding its contents.
 

 On March 28,1989, City National’s lending committee approved a $500,000 line of credit for Sheridan, subject to City National’s approval of each draw request made by Sheridan. The parties agreed that the line of credit would only be used to finance earnest money deposits. Sheridan further agreed to repay the funds when a sale closed and he had secured permanent financing, or when negotiations broke down and a sale failed to close. City National’s letter of commitment stated that Sheridan had to submit a “complete breakdown of the investment which the funds will be used to acquire, together with supporting documentation” with every request for funds. By signing this letter, Sheridan recognized that City National had relied on his financial statement.
 

 On April 24, 1989, Sheridan made his first draw request for $300,000 to make a principal payment to another bank. City National told Sheridan’s comptroller that the line of credit was not intended for that purpose, and Sheridan withdrew the request.
 

 On May 10, 1989, Sheridan requested $200,000 for earnest money deposits on property located in Carol Stream and Aurora, Illinois. City National approved the request and wired the money to Sheridan’s general business account. At the time he requested the draw, Sheridan’s account had a negative balance of over $117,000, which grew to over $175,000 on the day of the transfer. The loan proceeds brought Sheridan’s account to a positive balance. On May 25, Sheridan made an earnest money deposit of $100,000 on the Carol Stream property. On the same day, Sheridan received the proceeds from the sale of another property, which City National asserts is the money he used for the Carol Stream deposit. Sheridan deposited $100,-000 on the Aurora property on June 20, bringing his total deposits to $200,000, the amount of the May draw. City National presented evidence that just prior to his request for the draw, Sheridan had borrowed $275,000 from Manufacturers Hanover Trust Company (“MHT”) for an earnest money deposit on the Aurora property, although he made no such deposit in May.
 

 On August 4, 1989, Sheridan deposited $150,000 on the Aurora property. He requested a $200,000 draw for down payments on that and the Carol Stream property on August 23, 1989. Two days later, Sheridan sent a letter terminating negotiations for the Aurora property, and on August 31, before he had received the money from City National, Sheridan requested the return of his Aurora deposits. City National transferred the
 
 *631
 
 draw proceeds to Sheridan on September 5, 1989, at which time Sheridan’s account had a negative balance of approximately $8,000. Sheridan received the $250,000 Aurora deposit refund on September 7, and although Sheridan knew he had to repay the bank upon this event, his comptroller failed to do so. On September 13, Sheridan deposited $100,000 on the Carol Stream property.
 

 Sheridan repaid the May loan in full on November 13, 1989, at which time he still owed City National $200,000, the total of his deposit on the Carol Stream property. At the end of November, Sheridan provided City National with his August, 1989 financial statement listing his net worth at approximately $31 million. The Carol Stream property purchase closed on December 15, 1989, but Sheridan did not inform City National of this occurrence.
 

 On February 26, 1990, Sheridan requested $300,000 for an earnest money deposit on industrial property in Florida as well as for short-term cash flow needs, which City National approved and paid. In February, Sheridan also negotiated for the renewal of the August, 1989 draw. He informed City National that the Carol Stream deal had closed but City National renewed the note without inquiring as to why Sheridan had not repaid the money at the time of the closing. Both notes came due on May 15, 1990, at which time Sheridan asked for a further extension. City National requested an updated financial statement which indicated Sheridan had a net worth of approximately $32 million. In response to City National’s inquiry whether he was in default on any other loans, Sheridan stated no, although evidence presented at trial showed he was in default to his primary lender, MHT.
 

 City National granted Sheridan’s request for an extension and, upon receipt of a $100,-000 payment, gave Sheridan an additional extension when the notes came due in June, 1990. Sheridan failed to repay either loan on their final due date, July 27, 1990. In August, he informed all of his lenders that he could not pay them. On February 26, 1991, City National obtained a judgment against Sheridan for $438,385.69. Sheridan filed for Chapter 11 bankruptcy on April 26,1991. In his petition, Sheridan stated he had a negative net worth of approximately $16.6 million.
 

 City National moved the bankruptcy court to hold its judgment against Sheridan non-disehargeable. It alleged that Sheridan had made materially false written statements regarding his financial position on which City National had relied in lending him money, referring to the three financial statements. 11 U.S.C. § 523(a)(2)(B). City National also contended that Sheridan had obtained the August, 1989 loan under false pretenses by representing that he would use the proceeds as earnest money' deposits on the Aurora property when he had no intention of doing so. 11 U.S.C. § 523(a)(2)(A).
 

 At trial before the bankruptcy court, City National presented the expert testimony of Harold Sullivan, a certified public accountant and the partner in charge of Ernst & Young’s reorganization practice. Sullivan is also certified as a business valuation appraiser and oversees Ernst & Young’s valuation department. He testified that each of Sheridan’s three financial statements materially overstated the value of his real estate investments and his net worth. Sullivan asserted that at all relevant times, Sheridan’s actual net worth was close to zero.
 

 Sullivan reached his conclusions after examining Sheridan’s five largest investments, which accounted for over 75% of the real estate holdings and 54% of the assets listed on the financial statements. Sheridan owned none of the property directly. Rather he had general partnership interests in partnerships that owned them and he owned the stock of Edgemont, which held limited partnership interests in the partnerships. Sullivan testified that Sheridan’s equity interest in the properties only equaled their values after all other creditors were paid. Sullivan stated, however, that Sheridan’s papers indicated he used asset discount rates to determine his equity interests in the properties. This process increased Sheridan’s equity interest by using lower discount rates, thereby underestimating his risk and overvaluing his interests. City National also presented evidence that the financial statements listed values for each property that were several million dollars above Sheridan’s recent purchase
 
 *632
 
 price or his recent appraisal values. Sullivan concluded that to arrive at the values contained in his financial statements, Sheridan must have used inflated cash flows and applied an inappropriate discount rate.
 

 Sullivan computed his own values for the properties based on actual cash flows, appraisals, recent selling prices, and the partnerships’ financial statements. These calculations led Sullivan to conclude that Sheridan had overstated his real estate interests by at least $20.4 million in August, 1988, $18.1 million in August, 1989, and $21.4 million in February, 1990. Sullivan stated that Sheridan’s net worth at these times was close to zero rather than the approximately $30 million Sheridan had represented to City National. Sullivan did, however, prepare other sets of valuations, one of which resulted in a range of values within 15% of Sheridan’s values, a result Sullivan admitted was “a reasonable variation.” Sullivan also acknowledged several errors and inconsistencies in his conclusions.
 

 Sheridan’s accountant testified that Sheridan did not use current income streams to value his properties. He stated that although Sheridan’s organization computed the valuations, his accounting firm compiled the financial statements. Sullivan acknowledged that the accountants could not have issued the financial statements had they been aware of anything being seriously amiss. Lederer testified that he prepared the valuations and showed them to Sheridan, who would sometimes change the analysis and comment upon it. Sheridan testified that he had input into the assumptions underlying the valuations and that he possessed the data regarding the properties’ actual performance when preparing the financial statements. Sheridan also testified that he had used the same procedures to evaluate whether to purchase property and that many different people participated in the process. Each of the financial statements stated that some or all of the real estate investment valuations had been based on projected net cash flow and included the range of discount rates used, but City National had never inquired into Sheridan’s underlying assumptions.
 

 Regarding the false pretenses claim, Sheridan and Stuart Lederer, the general partner in charge of real estate acquisitions, testified that the termination of negotiations and request for refund letters did not signify the true end of the Aurora deal because the whole course of those negotiations had been very volatile. Sheridan further stated that the Aurora deal “blew up for the last time sometime in September,” although he knew that fact only through hindsight. Lederer testified that even after earnest money deposits had been refunded a deal could remain open and negotiations could resume.
 

 Sheridan and three employees testified that they could never know how much or when earnest money would be needed. Sheridan thus tried to anticipate future needs and borrow in advance. Sometimes, however, he had to make a deposit before a draw request was processed and would then use the loan proceeds to replenish those funds.
 

 After City National had presented its case, the bankruptcy court directed a verdict for Sheridan on all counts. In an oral ruling, the court found that while the evidence was persuasive that Sheridan had used an incorrect discount rate in valuing his assets on the three financial statements, City National had failed to prove that Sheridan had acted with an intent to deceive. As to the false pretenses claim, the court found that Sheridan used the loan proceeds as he had represented he would in the draw requests. The district court affirmed the bankruptcy court’s determination regarding the financial statements, finding that it had applied the correct legal standard, but remanded for specific findings on the false pretenses claim. On remand, the bankruptcy court made twenty-nine factual findings, once again concluding that Sheridan had made earnest money deposits on the properties he sought the loans for in amounts equal to the loans. The court held that because money is fungible, it did not matter that Sheridan had not made the deposits with the exact money transferred by City National. The district court affirmed the decision and this appeal followed.
 

 
 *633
 
 II.
 

 City National contends that the bankruptcy court applied incorrect legal standards by holding that it could not prove Sheridan’s intent to deceive through circumstantial evidence and by making a requirement of segregation of funds an element of proof that Sheridan obtained a loan under false pretenses. City National also argues that the court improperly prohibited its expert from testifying as to what Sheridan would have had to have known about his allegedly false financial statements. Finally, City National urges us to hold that the bankruptcy court’s factual findings regarding the false pretenses claim are clearly erroneous.
 

 We, like the district court, review the bankruptcy court’s legal conclusions
 
 de novo. Meyer v. Rigdon,
 
 36 F.3d 1375, 1378 (7th Cir.1994). We review factual findings for clear error, and will reverse them when, “although there is evidence to support [the findings, we are] left with the definite and firm conviction that a mistake has been committed.”
 
 Matter of Thirtyacre,
 
 36 F.3d 697, 700 (7th Cir.1994) (quoting
 
 Anderson v. Bessemer City,
 
 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1987)).
 

 A.
 

 In order to prevail on a claim under 11 U.S.C. § 523(a)(2)(B), a creditor must prove by a preponderance of the evidence that a debtor made, with an intent to deceive, a materially false written statement regarding his financial condition and that the creditor relied on that statement.
 
 See Matter of Harasymiw,
 
 895 F.2d 1170, 1172 (7th Cir.1990);
 
 see also Grogan v. Garner,
 
 498 U.S. 279, 287-88, 111 S.Ct. 654, 659-60, 112 L.Ed.2d 755 (1991) (preponderance of evidence, not clear and convincing standard, applies). At issue here is whether Sheridan possessed the requisite intent when he submitted his financial statements to City National.
 
 [1]
 
 Of course, a party can prove an intent to deceive through direct evidence. Alternatively, this court has held that wrongful intent may “logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan.”
 
 In re Kimzey,
 
 761 F.2d 421, 424 (7th Cir.1985);
 
 see also Matter of Garman,
 
 643 F.2d 1252, 1260-61 (7th Cir.1980) (“[W]here ... a person knowingly or recklessly makes a false representation which the person knows or should know will induce another to make a loan, intent to deceive may be logically inferred.”) (quoting
 
 Carini v. Matera,
 
 592 F.2d 378, 380 (7th Cir.1979)),
 
 cert. denied,
 
 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981);
 
 In re Olinger,
 
 160 B.R. 1004, 1012 (Bkrtcy.S.D.Ind.1993);
 
 In re Austin,
 
 138 B.R. 898, 914 (Bkrtcy.N.D.Ill.1992).
 

 City National argues that the bankruptcy court incorrectly held that circumstantial evidence can never prove an intent to deceive, contravening our teachings in
 
 Kimzey.
 
 The district court, reading the bankruptcy court’s oral ruling in its entirety, determined that the bankruptcy court had not so held, but rather had concluded that City National’s circumstantial evidence did not support a finding of wrongful intent in this ease. We agree.
 

 The court stated that City National had presented no direct evidence that Sheridan knew or believed that the values of the properties contained in the financial statements were inflated. It also noted that witnesses had testified that Sheridan had used the same valuation process for internal business purposes and financial statements long before he had any dealings with City National. Sheridan did not prepare the statements by himself and did not unduly influence his employees to make certain valuation decisions or do anything other than follow their own best judgment. The court continued:
 

 The circumstantial evidence that may be in the record is consistent with an overly aggressive but nonfraudulent approach to real estate investments.
 
 That is circumstantial evidence and is not enough on which to base a finding of the reckless or wrongful intent.
 

 
 *634
 
 We first note that some of the evidence discussed by the bankruptcy court is circumstantial, contrary to City National’s assertion that the court exclusively emphasized the lack of direct evidence. The court did not discuss all of City National’s submissions, but it cannot be faulted for failing to mention every piece of evidence presented, especially in an oral ruling. After discussing certain evidence, the court stated the conclusion it drew from the circumstantial evidence in the record, thus indicating an awareness of its relevance. In fact, the court specifically recognized that circumstantial evidence could prove intent: “[T]o me, the evidence is equally persuasive that the debtor did not [use an incorrect discount rate] with the intent to deceive ... or with
 
 such reckless disregard for the truth that such intention [can] be inferred."
 
 Thus, we conclude that the bankruptcy court applied the correct legal standard, considered the circumstantial evidence, and determined that, in light of the other evidence (or lack thereof) presented in this case, it did not support a finding of wrongful intent.
 

 City National could have challenged the bankruptcy court’s finding as clearly erroneous, but chose not to do so. Instead, it asserts that the bankruptcy court must have used an incorrect legal standard because otherwise it would not have directed a verdict for Sheridan given the strong circumstantial evidence City National had presented. The court found that Sheridan had used an “incorrect discount rate in valuing the assets because he used a rate applicable to the property value rather than the equity value.” City National points to courts that have found an intent to deceive based on similar misrepresentations or omissions by an experienced debtor, such as Sheridan.
 
 See In re Cunningham,
 
 163 B.R. 657, 661 (Bkrtcy. D.Mass.1994);
 
 In re Bailey,
 
 145 B.R. 919, 931 (Bkrtcy.N.D.Ill.1992);
 
 In re Hall,
 
 109 B.R. 149, 155 (Bkrtcy.W.D.Pa.1990);
 
 In re Janes,
 
 51 B.R. 932, 936 (Bkrtcy.D.Kan.1985);
 
 In re Blatz,
 
 37 B.R. 401, 404 (Bkrtcy. E.D.Wis.1984). In addition, City National cites to cases in which the court inferred an intent to deceive based on a dramatic decline in net worth, such as occurred here.
 
 See Bailey,
 
 145 B.R. at 931;
 
 In re Myers,
 
 124 B.R. 735, 741 (Bkrtcy.S.D.Ohio 1991),
 
 district court dismissal aff'd,
 
 961 F.2d 1577 (6th Cir.1992);
 
 Blatz,
 
 37 B.R. at 401.
 

 While these cases would support the bankruptcy court’s decision had it inferred an intent to deceive from the circumstantial evidence admitted in this case, they do not compel such a finding and do not require us to reverse the court’s holding.
 
 Kimzey
 
 stated that an intent to deceive
 
 may
 
 be inferred from certain evidence and did not hold that a court
 
 must
 
 infer intent whenever a creditor presents circumstantial evidence of the type discussed above. Whether to infer the requisite intent is left to the bankruptcy court that presides over the case. Because that court is in the best position to observe the witnesses and presentment of the evidence, we review its findings only for clear error, an argument City National has not made.
 
 See Janes,
 
 51 B.R. at 936 (court noted that it observed the debtor’s demeanor and evaluated his credibility when inferring intent from misstatements and omissions). The bankruptcy court recognized the applicability of circumstantial evidence and the cases cited by City National do not convince us that it then ignored that evidence in reaching its conclusion.
 

 B.
 

 City National next objects to the bankruptcy court’s refusal to allow its expert, Sullivan, to testify as to what Sheridan would have had to have known regarding property values given his experience in the real estate field. A district court has great discretion over the admission of expert testimony, and we review only for an abuse of that discretion.
 
 United States v. Lilly,
 
 37 F.3d 1222, 1228 (7th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1155, 130 L.Ed.2d 1112 (1995).
 

 As an initial matter, Sheridan asserts that City National has waived this argument by falling to raise it before the district court. City National counters that it did sufficiently argue the issue below and the district court’s failure to address it does not constitute a waiver. In its brief in the district court, City National claimed that Sulli
 
 *635
 
 van should have been allowed to respond to the question, but it is not clear that this contention can be construed as an appeal of the court’s ruling. Indeed, in that brief, City National argued that it had raised
 
 two
 
 legal issues: whether the bankruptcy court applied two incorrect legal standards to its claims. Moreover, the assertion of error was contained not in a separate section, but merely in a discussion of the proof that the court did not accept circumstantial evidence as relevant to the issue of intent to deceive. We need not decide the waiver question, however, because City National has failed to meet its burden of showing that the bankruptcy court abused its discretion in excluding this testimony.
 

 The court would not allow Sullivan to answer the several restatements of the question posed by City National about Sheridan because it did not believe Sullivan had the expertise to “psychoanalyze” Sheridan. City National merely contends, citing to two cases in which the court inferred an intent to deceive based on the debtor’s expertise, that Sullivan’s answer would have been relevant. City National also asserts that the court could have admitted the testimony under either Fed.R.Evid. 701 or 702. In
 
 United States v. Gurry,
 
 we affirmed the district court’s exclusion of an expert who would have testified about eyewitness identifications even though her testimony “may not have been unhelpful” and the court had no quarrels with her competency. 977 F.2d 1042, 1051-52 (7th Cir.1992),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993). An appellate reversal of a decision to limit an expert’s testimony requires more than bare arguments that the expert is qualified and his testimony would be relevant. Indeed, the abuse of discretion standard requires the challenging party to show that no “reasonable person would have agreed with the district courtfs ruling].”
 
 Holmes v. El-gin, Joliet & Eastern Railway Co.,
 
 18 F.3d 1393, 1397 (7th Cir.1994). City National has not met its burden here.
 

 C.
 

 Regarding its claim under 11 U.S.C. § 523(a)(2)(A), City National asserts that the bankruptcy court once again applied an incorrect legal standard and that its findings are clearly erroneous. To prevail on a false pretenses claim, the creditor must show that the debtor obtained the money “through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation.”
 
 Kimzey,
 
 761 F.2d at 423. City National must also prove that Sheridan acted with an intent to deceive and that City National relied on Sheridan’s misrepresentations.
 
 Matter of Mayer,
 
 51 F.3d 670, 674-76 (7th Cir.1995) (“Reliance means the conjunction of a material misrepresentation with causation in fact.” A misrepresentation is not material if the creditor knows it is false or “possesses information sufficient to call the representation into question...”);
 
 see also
 
 11 U.S.C. § 523(a)(2)(A).
 

 We have held that when a creditor entrusts the debtor with money to use for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists upon which a debt can be held non-dischargeable.
 
 In re Pappas,
 
 661 F.2d 82, 86 (7th Cir.1981). In other words, proof that the debtor never put the money toward the stated purpose allows a court to infer the requisite intent. City National argues that the bankruptcy court erroneously engrafted the requirement that City National have ordered Sheridan to segregate the loan proceeds in order to prove the misrepresentation. The court noted, in its findings of fact, that while Sheridan may not have used the exact funds loaned to him by City National, he did, either before or after receiving the money, make the deposits. The court stated that the order of receipt and deposits did not matter because the “effect on City National is the same as if the proceeds of the August Draw had been used directly for the deposit. Given City National’s practice of depositing funds into a general account and the fungibility of money, ... City National has not proven that [Sheridan] did not intend to use the proceeds of the August Draw for the stated purposes.”
 

 As Sheridan contends, if the bankruptcy court felt that the lack of a segregation requirement was fatal to City National’s claim, the court would have had no reason to
 
 *636
 
 address the facts of the case. It made, however, twenty-nine conclusions of fact and discussed the different loans and deposits by Sheridan. In these circumstances, we do not believe that the court’s mention of the lack of a segregation requirement raised the level of proof needed to show false pretenses. Rather, the court appropriately recognized the fungibility of money and found that absent a segregation provision, the important question is whether the debtor made use of equivalent amounts of money in the required manner. The cases cited by City National in which courts have followed the principle announced in
 
 Pappas
 
 are thus inapposite to this situation. In those cases, the debtor had put either no money or only a portion of the proceeds toward the purpose given in its loan request. The courts held non-dischargeable the amount of the loans not used in the required manner.
 
 See In re Segala,
 
 133 B.R. 261, 264 (Bkrtcy.D.Mass.1991);
 
 In re Eversole,
 
 110 B.R. 318, 323 (Bkrtcy.S.D.Ohio 1990);
 
 In re Norton,
 
 34 B.R. 666, 668 (Bkrtcy.D.Ariz.1983);
 
 see also In re Kroh,
 
 88 B.R. 972, 983 (Bkrtcy.W.D.Mo.1988);
 
 In re Blagaich,
 
 67 B.R. 375, 377 (Bkrtcy.S.D.Fla.1986);
 
 In re Jones,
 
 50 B.R. 911, 921 (Bkrtcy. N.D.Tex.1985);
 
 In re Wade,
 
 26 B.R. 477, 483 (Bkrtcy.N.D.Ill.1983). These decisions contrast with the instant case, in which the court concluded that Sheridan did use money for the purposes he had represented on his draw requests.
 

 City National also claims that the court’s findings that Sheridan used the August loan for his stated purpose are clearly erroneous. The court noted that the draw request was for earnest money deposits on properties in Carol Stream and Aurora. The court found that Sheridan had made a $100,000 deposit on the Carol Stream property after receiving the August draw proceeds. The court further found that Sheridan had used the remainder to replenish his business account from which he had previously made a $100,-000 deposit on the Aurora property. Moreover, the court noted that after Sheridan repaid the May draw in November, he owed City National $200,000, the amount of his deposit on the Carol Stream property and the amount of the August draw.
 

 Sheridan testified, without contradiction, that he would sometimes need to deposit money before a loan was processed and then would use the funds when received to replenish his account. The court relied on this practice, which City National did not prohibit, to find that the August 3 deposit should be credited against the August draw. City National argues, however, that Sheridan testified he would use his own money while waiting for a loan to come through, not, as occurred here, use his own money and then first request the necessary loan two weeks later. While the timing does seem a bit strange, the court assessed Sheridan’s credibility and did not clearly err in inferring appropriate conduct from his testimony.
 

 City National further objects to the court’s finding that Sheridan did not obtain the loan under false pretenses by accepting the draw proceeds after he had terminated negotiations on the Aurora property and had requested the return of his earnest money deposits. The court found that the termination and refund letters did not necessarily signify the end of negotiations. We find nothing wrong with the court’s decision, which it based on Sheridan and Lederer’s uncontroverted and “completely credible” testimony.
 

 As the ' court found, Sheridan made deposits on the properties in question in the same amounts it borrowed from City National. Sheridan did not make the deposits with the exact money forwarded by City National, but the court correctly emphasized the fact that money is interchangeable. It does not matter that Sheridan had negative account balances at the time of the money transfers; it matters that he put money to the use he promised. Neither Sheridan’s failure to repay the May draw upon the return of the Aurora deposit nor his neglect to repay the August draw when the Carol Stream deal closed in December necessarily reflect his intent at the time he requested the draws.
 

 For the foregoing reasons, the decision of the district court affirming the decision of the bankruptcy court is
 

 AFFIRMED.
 

 [1]
 

 . City National argues that the court found that Sheridan’s financial statements were materially false, a contention Sheridan disputes. We need not discuss this element because we hold that the court applied the correct legal standard.