SHAW STEEL, INC., Plaintiff–Appellant,

v.

Hewlett E. MORRIS. Jr. a.k.a. H. Edward Morris, Jr., Defendant–Appellee.

No. 99 C 2327.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 8, 1999.

Gary E. Dienstag, Springer, Casey, Dienstag & DeVitt, P.C., Chicago, IL, Donald N. Jaffe, Persky, Shapiro, Salim, Esper, Arnoff & Nolfi Co., L.P.A., Cleveland, OH, for Plaintiff.

Richard L. Hirsh, Richard L. Hirsh & Assoc., P.C., Hinsdale, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

This case poses the question of whether someone who relies to his detriment on the intentional misrepresentations of someone he plausibly believes to be a liar and a cheat can claim to have reasonably relied upon those misrepresentations for the purpose of avoiding the dischargeability of the deceiver's debts in bankruptcy. I conclude that he cannot. After Shaw Steel had won a substantial fraud judgment against O.L. Anderson Co. ("Anderson"), of which Hewlett Morris ("Morris") was then Chairman and CEO,[1] Shaw Steel, in exchange for a promise of a payment of $35,000, signed a settlement agreement with Morris in which he made various representations about his financial condition which he knew to be lies. Shaw Steel won a consent judgment in arbitration based on Morris's prevarications and won a lawsuit in federal district court, Northern District of Ohio, to enforce the arbitrator's award. Morris then declared bankruptcy. The bankruptcy court held that the Ohio judgment was dischargeable in bankruptcy because Shaw Steel had not reasonably relied upon Morris's misrepresentations. Shaw Steel appeals, and I affirm.

### I.

Morris is a liar, a scoundrel, and a fraudster,[2] and that is his defense in this case. In 1993, Shaw Steel sued Anderson and Morris in the federal district court for the Northern District of Ohio for unpaid shipments Shaw Steel had made to Anderson and because Morris had fraudulently induced Shaw Steel to extend a line of credit to Anderson. Shaw Steel won a judgment of $215,836.69 against Anderson. By stipulation of the parties, Shaw Steel's claim against Morris was dismissed without prejudice. When Anderson dissolved without paying the judgment, Shaw Steel sued Morris for fraud and other damages. In July 1994, just before the case went to trial, Shaw Steel and Morris stipulated to a dismissal of the case with prejudice.

On August 22, 1994, Shaw Steel executed a settlement agreement and mutual general release (the "Agreement"), which provided for a payment of $35,000 by Morris to Shaw Steel. The Agreement was expressly based in part upon representations by Morris as to the accuracy of an attached affidavit of May 16, 1995 describing his financial condition and his consent to Shaw Steel's investigation into the accuracy of those representations. The Agreement gave Shaw Steel the right to challenge the material accuracy of those representations through arbitration, and provided that if Shaw Steel won such an arbitration, a consent judgement in the amount of $215,000 could be filed with the Northern Ohio district court and that Morris would pay the costs of the arbitration.

Shaw Steel subsequently availed itself of its right under the Agreement to investigate Morris's financial situation. This investigation indicated that he had indeed lied about his situation. In July 1995,

---

1. There are two unrelated Morrises in this case. In addition to Hewlett Morris, there is also Melvin Morris, Shaw Steel's Vice President, who plays an important role in the story. I refer to Hewlett Morris by his last name ("Morris") and to Melvin Morris by his given and last names ("Melvin Morris").

2. Morris does not concede that he ever defrauded Shaw Steel and asserts that no court or adjudicating body determined that he has done so. Morris has not indeed been found

liable for fraud in a narrow sense in his relations with Shaw Steel. Artfully timed settlements prevented trials on the issue. But an arbitrator determined that Morris lied to Shaw Steel about his financial situation in entering into a settlement agreement, and this factual finding was accepted by the bankruptcy court. That is close enough to count as a determination of fraud by adjudicating bodies, at least with respect to the settlement agreement if not the underlying transactions.

Shaw Steel commenced arbitration proceedings. Morris sued in Michigan state court to enjoin these as untimely. Shaw Steel removed the action to the federal district court for the Eastern District of Michigan, which granted Shaw Steel summary judgment. The arbitrator's award, rendered April 16, 1997, held that Morris's representations contained material falsehoods. In August 1997, Shaw Steel then sued to enforce the award in the Northern Ohio District Court, which ruled that Morris must pay the consent judgment and the arbitration fees, costs, and expenses.

At this point, on December 23, 1997, Morris filed a voluntary petition of bankruptcy in the Northern District of Illinois under Chapter 7 of the Bankruptcy Code. The bankruptcy court ruled that Morris's debt to Shaw Steel was dischargeable in bankruptcy, despite his lies, essentially because Shaw Steel had unreasonably relied upon Morris's misrepresentations, knowing that he was a liar and the truth was not in him. Shaw Steel now appeals this judgment.

## II.

■ I review a bankruptcy court's findings of fact for clear error and its legal conclusions de novo. *In the Matter of A–1 Paving and Contracting, Inc.*, 116 F.3d 242, 243 (7th Cir.1997). Discharge of debts in bankruptcy is in a sense the whole point of the bankruptcy laws, giving the debtor a "fresh start." *In the Matter of Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998). When deciding whether a particular debt is dischargeable, courts generally construe the statute "strictly against the objecting creditor and liberally in favor of the debtor." *Id.* A party seeking to establish an exception to discharge bears the burden of proof. *In re Reines*, 142 F.3d 970, 973 (7th Cir.1998).

■ Here, the exception to dischargeability Shaw Steel invokes is section 523(a)(2)(B) of the Bankruptcy Code, which concerns debts incurred through materially false written statements:

A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt-

\* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by-

\* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive. . . .

11 U.S.C. § 523(a)(2)(B). In order to prevail on a claim under § 523(a)(2)(B), thus excluding a debt from discharge in bankruptcy, a creditor must prove by a preponderance of the evidence that a debtor made, with an intent to deceive, a materially false written statement regarding his financial condition and that the creditor relied on that statement. *In the Matter of Sheridan*, 57 F.3d 627, 633 (7th Cir.1995).

■ To avoid discharge of the fraudulently obtained debts, the reliance on the misrepresentations must be "reasonable," § 523(a)(2)(B)(iii), which the Supreme Court has interpreted to mean "justifiable." *Field v. Mans*, 516 U.S. 59, 73, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The Supreme Court has said that justifiable reliance is an "intermediate" level of reliance, in between actual reliance and full-blooded reasonable reliance. *Id.* at 73, 116 S.Ct. 437. The Court stated that "[w]e think it unlikely that Congress ... would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The

main difference between "reasonable" and "justifiable" reliance is that reasonable reliance requires such investigation into the truth of the debtor's representations as a reasonable person would make, but justifiable reliance does not. *Field,* 516 U.S. at 72, 116 S.Ct. 437. Whether investigation is required depends on "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 71, 116 S.Ct. 437.

 However, whether or not Shaw Steel was required to conduct a prior investigation, it was not entitled to go into the deal with eyes wide shut and still gain the benefit of the § 523(a)(2)(B) exception. The question of the reasonableness of a creditor's reliance may be "highly dependent on the particular facts of the lending transaction", as the Seventh Circuit instructs, and courts should not "be eager to intrude into the [creditor's] business practices." *In the Matter of Bogstad,* 779 F.2d 370, 372 n. 4 (7th Cir.1985), *overruled on other grounds by Grogan,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In *Bogstad,* however, the court noted that there was no particular reason to suspect the debtor was other than honest. The court there said: "Had there been evidence of applicant's prior reputation for untruthfulness, any reliance upon [the debtor's] statement without an independent investigation would, of course, have been unreasonable." *Id.* In this case, there was such evidence.

Melvin Morris, Vice President of Shaw Steel, testified that he accepted and relied upon the truthfulness of Morris's representation in the Agreement despite well-founded qualms and doubts. On January 12, 1999, Melvin Morris testified that when he signed the Agreement, he accepted "that the statements [Morris made about his financial condition] were true" or "gospel." However, in his deposition, asked whether he trusted Morris when they made the deal, Melvin Morris replied: "I had my reservations about his honesty. People lost millions of dollars with him, not just me, others; millions and millions of dollars because of him. You can line them up and ask all of them how many would trust him. He'd be a question mark." Asked on cross examination if he knew when he signed the Agreement whether the affidavit was true or false, Melvin Morris said, "I did not know, but I had to accept it for what it was. And ... if it was right, I got what I bargained for." He added, "Regardless of my former opinion of whether he was a truthful ... man, you have a new settlement agreement in front of you.... in black and white. Now, would I have signed the agreement if I didn't have the right to audit? Not on your life." Finally, Howard Klein, Shaw Steel's investigator, testified that Melvin Morris and Harry Sulzer, then President of Shaw Steel, told him when they hired him that they did not believe Morris's financial statement. Klein testified that he was to verify the statement because Shaw Steel "had been lied to once and they wanted to make sure they weren't being lied to again."

Therefore, Shaw Steel knew that Morris was a liar. Vice President Melvin Morris "had reservations" about Morris's honesty and regarded him as a "question mark" who was responsible for many people losing many millions of dollars. Melvin Morris knew that Morris's reputation was that of a fraudster and had personal reason to believe that reputation was warranted. He did not in fact know whether this one time Morris was telling the truth and "not on your life" would he have accepted the deal without the right to audit. But he accepted it. Can he really be surprised with the outcome?

Shaw Steel does not dispute that I am to review the bankruptcy court's determination that its reliance was not justifiable for clear error. A clearly erroneous standard is a high one. I will reverse only if I have a "firm and definite conviction" that the trial court made a mistake. *Anderson v.*

*Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (internal citation omitted). " 'To be clearly erroneous, a decision must strike [a court] as more than just maybe or probably wrong; it must ... strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish.' " *Piraino v. Int'l Orientation Resources, Inc.,* 137 F.3d 987, 990 (7th Cir.1998) (internal citation omitted).

Shaw Steel argues that the bankruptcy court erred holding that Shaw Steel could not reasonably have relied upon Morris's representations without first conducting an investigation. If the bankruptcy court thought that an investigation was required because a reasonable person would have investigated, it erred as a matter of law. In view of *Field,* 516 U.S. at 72, 116 S.Ct. 437, no such investigation is required in general by the law. However, *Field* does not hold that an investigation is never required, but that whether an investigation is required depends on the circumstances. See *id.* at 71, 116 S.Ct. 437. Here Shaw Steel could not have relied upon the Morris's representations when it had good reason to think they were false and when it admits that it did not know whether they were true and so, in the circumstances, should have investigated them.

Indeed, even if there were no requirement of investigation in this particular case and under these circumstances, it would not matter, since Shaw Steel had every reason to distrust and did in fact distrust the veracity of Morris's representations. Investigation or no, that was not justifiable reliance. The attitude of an ostrich is not one protected by the courts. See *Bogstad,* 779 F.2d at 372 n. 4; *Field,* 516 U.S. at 76, 116 S.Ct. 437 ("Naifs may recover ... in bankruptcy, but lots of creditors are not at all naive."). Shaw Steel cannot claim to be naive.

Shaw Steel further argues that the Agreement itself specifies that it entered the Agreement with Morris based upon the contested representations, see Agreement, Paragraph 4, and for this reason it was clear error for the bankruptcy court to hold that Shaw Steel's reliance was not reasonable. Even if it did not fully trust Morris, Shaw Steel says, it was "still bound by the terms and provision of the settlement and [ ] could not set the settlement aside." This is question-begging in a fairly spectacular way. The agreement may have been binding once signed, although it may be noted that, as a general matter, "fraud in the procurement of any contract, makes it void and unenforceable," *Moseley v. Electronic & Missile Facilities, Inc.,* 374 U.S. 167, 172, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963) (Warren, C.J., and Black, J., concurring). However, the question before me is not whether Shaw Steel was bound by the Agreement, but whether it reasonably relied on Morris's representations in entering the Agreement. The bankruptcy court did not clearly err in deciding that Shaw Steel's reliance on Morris's financial statement was unreasonable.

Finally, Shaw Steel contends that it was reasonable to rely on Morris's representations because they were in affidavits submitted under oath as part of the resolution of disputed litigation. Shaw Steel cites various federal rules of procedure calling for the use of affidavits in litigation. Needless to say, Shaw Steel does not cite any case law standing for the proposition that a party may reasonably rely upon the affidavit of a known liar and cheat which, on its own admission, it distrusted, did not know to be true, and would not accept ("Not on your life.") without further investigation. The Seventh Circuit has not looked favorably on such a view. *See Bogstad,* 779 F.2d at 372 n. 4. ("Although the court[s] should protect lenders from unscrupulous debtors, it is not our business to bail out any lender no matter how recklessly it gives out its money."). Shaw Steel got what it bargained for, or at least it got what it bargained for was worth. It cannot look to the courts to rescue it from the consequences.

The judgment of the bankruptcy court is affirmed.